2014 VT 31

# Christopher Moreau v. Noel Sylvester

# Noel Sylvester v. Christopher Moreau

[95 A.3d 416]

Nos. 12-152 & 12-154

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed April 4, 2014

*Steven A. Adler* and *Daniel D. McCabe* of *Axelrod & Adler, PLLC*, St. Johnsbury, for Plaintiff-Appellant (12-152) and Defendant-Appellant (12-154).

*Noel Sylvester*, Pro Se, Morrisville, Defendant-Appellee (12-152) and Plaintiff-Appellee (12-154).

¶ 1. **Burgess, J.** In this consolidated appeal defendant Christopher Moreau contests the Washington family court's dismissal of his emergency petition for child custody and parentage complaint over children with whom he shares no biological or other established legal connection, as well as the Caledonia family court's issuance of a relief-from-abuse (RFA) order denying him visitation with the children.[1] Defendant contends that he is the children's de facto parent and entitled to assert and be heard on custody, parentage and visitation rights. We disagree and affirm.

¶ 2. The following background is drawn from findings of fact made by the Caledonia family court at the final RFA order hearing. Plaintiff and defendant were in an on-again-off-again relationship for eight to ten years; they never married. Plaintiff is the mother of two children, born in 2003 and 2006. Defendant is not the biological father of either child. Nevertheless, he played a significant, father-figure role in both of the children's lives. Although plaintiff and defendant separated in February 2009, they had an ongoing arrangement for shared responsibility for the children. For example, the children lived with defendant for a

---

[1] Although Mr. Moreau is the defendant-appellant in docket 2012-154, he is the plaintiff-appellant in docket 2012-152. For the sake of clarity, Mr. Moreau will be referred to as defendant hereinafter.

period of time in May 2011 when flooding rendered plaintiff's residence uninhabitable. During the periods of care assigned to defendant, he was sometimes unwilling to return the children to their mother, and plaintiff testified credibly that this created a dangerous situation on at least one occasion.

¶ 3. The incidents giving rise to the present appeals occurred on March 5, 6 and 7, 2012. The parties' rapport had deteriorated in the preceding days, and the children were with plaintiff in the home she shared with her new partner. On March 5, defendant sent plaintiff a text message at 8:05 p.m. stating "I promise you, for the rest of my life, I will find my girls and I will never stop, ever."

¶ 4. In the early hours of March 6, defendant and a friend drove to the new partner's place of employment to confirm he was at his job and not at plaintiff's residence. Defendant and his friend then drove to plaintiff's home, arriving at approximately 2 a.m. They proceeded to knock on plaintiff's door for at least ten minutes. Defendant claimed that he did this out of concern for the children. Plaintiff was at home with her children without a vehicle or a cell phone she believed to be operable. Plaintiff was also aware that defendant owned a gun.

¶ 5. Twenty-four hours later, on March 7, defendant and his friend again drove to the new partner's place of employment to verify he was not at plaintiff's residence. Defendant and his friend arrived at plaintiff's home at 2 a.m., and defendant directed his friend to bang on plaintiff's door. Defendant then joined his friend and together they banged on the door until the police arrived. Defendant claimed that the purpose of the visit was to drop off some of the children's belongings so they could have them for school. Defendant gave these belongings to police officers who placed them in plaintiff's possession. Defendant was then served with a temporary RFA order, which plaintiff had obtained the day before.

¶ 6. At the final RFA hearing on April 3, 2012, the trial court concluded that defendant had placed plaintiff and her children in imminent fear of serious physical harm. The trial court issued an RFA order prohibiting defendant from contacting or interacting with plaintiff as well as the children for one year, noting that "[d]efendant is not their biological father." Defendant appeals this order in docket 2012-154.

¶ 7. Meanwhile, before the final RFA hearing and evidently unbeknownst to plaintiff, defendant filed in the Washington family court an emergency petition for visitation and a parentage complaint seeking sole physical and legal custody of plaintiff's children. The trial court dismissed both actions on April 24, 2012 because defendant is not related to the children in any way. Defendant appeals this dismissal in docket 2012-152.

¶ 8. ■ On appeal, defendant requests a remand for evidentiary findings as to whether he is a de facto parent of plaintiff's children and, if so, whether visitation is in the children's best interest. Defendant argues that: (1) we should apply the best-interest-of-the-children principle contained in Vermont custody statutes "to create enforceable visitation between children and de facto parents"; (2) we should reexamine our reasoning in *Titchenal v. Dexter*, 166 Vt. 373, 693 A.2d 682 (1997), denying equitable relief to persons asserting de facto parentage because "changing demographics in Vermont necessitate a modernized interpretation of the law"; and (3) in the past, this Court has interpreted existing statutes and the Vermont Constitution to expand custody and marriage laws.[2] Plaintiff, representing herself, did not file a responsive brief.

## I.

¶ 9. Some background on the development of parental rights and visitation law in Vermont, especially outside the context of divorce proceedings for persons not related by blood to children, will assist the reader. In 1984 the Legislature enacted the Parentage Proceedings Act, giving putative fathers the right, denied at common law, to establish paternity and thus pursue custody or visitation. 15 V.S.A. §§ 301-306.

¶ 10. In 1985, this Court recognized that 15 V.S.A. §§ 291 and 293 empowered courts to award custody to still-married stepparents in cases of desertion, nonsupport, or living separately. *Paquette v. Paquette*, 146 Vt. 83, 85, 499 A.2d 23, 25-26 (1985). The

---

[2] Defendant also contends that the Common Benefits Clause of the Vermont Constitution supports his de facto parentage claim. Vt. Const. ch. I, art. 7. Defendant raises this argument for the first time on appeal and thus failed to preserve it for review. See *In re Mullestein*, 148 Vt. 170, 175, 531 A.2d 890, 893 (1987) (declining to consider appellant's state constitutional argument when "it was not raised before the trial court, nor was that court's decision based upon it. Issues not presented below will not be considered on appeal.").

*Paquette* Court also acknowledged that former 15 V.S.A. § 652, which set forth custody guidelines for any "child of the marriage" in divorce proceedings, allowed courts to award custody to step-parents standing in loco parentis, but only upon a showing "by clear and convincing evidence that the natural parent is unfit or that extraordinary circumstances exist to warrant such a custodial order, and that it is in the best interests of the child." *Id.* at 86, 92, 499 A.2d at 26, 30.

¶ 11. Eight years later, we interpreted two provisions of Vermont's then-existing adoption statute, 15 V.S.A. §§ 431 and 448, to allow adoption by an unmarried, same-sex partner of the child's birth mother without having to terminate the natural mother's parental rights. *In re B.L.V.B.*, 160 Vt. 368, 369-70, 628 A.2d 1271, 1272-73 (1993). The statute authorized adoption by an unmarried "person," but, read literally, required terminating the "natural" parent's rights in favor of the adopting person's parental rights, except when the adopting person was a stepparent married to the natural parent. *Id.* at 370-71, 628 A.2d at 1273. We explained that, by "allowing same-sex adoptions to come within the step-parent exception of § 448, we are furthering the purposes of the statute as was originally intended by allowing the children of such unions the benefits and security of a legal relationship with their de facto second parents."[3] *Id.* at 375, 628 A.2d at 1276. Thus, our holding corrected an "unreasonable and unnecessary" application of the statute that would thwart an adoption in the child's best interests by a person otherwise qualified to adopt, but for her partnership with the mother. *Id.* at 369, 628 A.2d at 1272. In 1996 the

---

[3] The dissent cites *B.L.V.B.* as exemplary of "look[ing] beyond" the text of a statute to further legislative policy to serve the best interests of children. *Post,* ¶ 58. *B.L.V.B.* did not turn, however, on the undisputed best interests of the child alone, but rather primarily on our refusal to adopt the "unreasonable and irrational result" of terminating the rights of a fit natural parent to allow adoption by her fit partner — a result not intended by the Legislature. 160 Vt. at 373, 628 A.2d at 1274 (quotation omitted). Here, in stark contrast to *B.L.V.B.*, the parties do not want to share custody, the natural parent opposes defendant's request for parental recognition, it is not established that the children's best interests lie with defendant, and the per se denial of standing to defendant — who is not a biological, natural, adoptive, or even would-be adoptive, parent — to allow him to interfere with the biological mother's rights over her children is not facially ridiculous. Moreover, in contrast to the situation in *B.L.V.B.*, where the partner had statutory standing to petition for adoption in the first place, defendant enjoys no status as a "natural parent" necessary for standing absent an adoption or previous parentage adjudication. 15 V.S.A. § 302(a).

Legislature confirmed the *B.L.V.B.* holding in the new Adoption Act, 15A V.S.A. §§ 1-101—8-101, providing that "[i]f a family unit consists of a parent and the parent's partner, and adoption is in the best interest of the child, the partner of a parent may adopt a child of the parent" without terminating his or her parental rights. *Id.* § 1-102(b).

¶ 12. The concept of de facto parents was revisited in *Titchenal v. Dexter*, 166 Vt. 373, 693 A.2d 682 (1997), the case that is the focus of defendant's appeal here. *Titchenal* involved two women in a relationship who jointly participated in raising a child adopted by only one of them. The parties' relationship disintegrated, and the adoptive mother would not allow the plaintiff contact with the child. Lacking a statutory provision under which she could petition the family court, the plaintiff filed a complaint requesting the general civil court[4] to exercise its equitable power to establish parent-child contact. The complaint was dismissed for lack of jurisdiction. *Id.* at 375-76, 693 A.2d at 683. On appeal, the plaintiff urged this Court "to grant 'nontraditional' family members access to the courts by recognizing the legal rights of de facto parents" — those persons who share a bond with a child but otherwise no legally cognizable connection, either through biology, marriage, statute or court order. See *id.* at 376, 376 n.1, 693 A.2d at 683-84, 684 n.1 (explaining "de facto parent" as a person with psychological bond to child, and doctrine of "in loco parentis" as entailing emotional and financial support, and that "[f]or purposes of this opinion, we see no need to draw fine lines between the doctrines. Plaintiff's point is that though she is not the legal parent of [the child], in all other respects she has acted as the child's parent.").

¶ 13. ▉ The precise issue addressed in *Titchenal* was whether equity provided an avenue for the civil court to adjudicate visitation claims within the then-exclusive jurisdiction of the family court, but incapable of being brought in family court under Vermont statutes. *Id.* at 375, 693 A.2d at 683. The *Titchenal* plaintiff posited that the family court retained jurisdiction to adjudicate parent-child contact disputes capable of being brought in a statutory proceeding, and that the civil court had equitable powers to adjudicate disputes involving parties not recognized by

---

[4] Following court unification in 2010, there is one superior court that includes the previous family and civil courts, now respectively designated as the family division and civil division. 4 V.S.A. §§ 1, 31, 33.

statute — such as claims brought by putative de facto parents. We found "no legal basis for plaintiff's proposal" because "[c]ourts cannot exert equitable powers unless they first have jurisdiction over the subject matter and parties. . . . Equity generally has no jurisdiction over imperfect rights arising from moral rather than legal obligations; not every perceived injustice is actionable in equity — only those violating a recognized legal right." *Id.* at 377, 693 A.2d at 684.[5]

¶ 14. Post-*Titchenal*, third-party child visitation rights reached the U.S. Supreme Court in *Troxel v. Granville*, 530 U.S. 57 (2000). The Supreme Court held that, despite the "changing realities of the American family," a Washington State statute allowing for "[a]ny person" to petition for child-visitation rights "at any time" was impermissibly overbroad and an unconstitutional infringement upon the fundamental rights of parents to rear their children. *Id.* at 60, 64, 73. Declining to "define . . . the precise scope of the parental due process right in the visitation context," the Court left open the possibility of third-party child-visitation statutes but cautioned that "any standard for awarding visitation turns on the specific manner in which that standard is applied . . . the constitutional protections in this area are best elaborated with care." *Id.* at 73 (quotation omitted); see also *Glidden v. Conley*, 2003 VT 12, ¶¶ 19-21, 175 Vt. 111, 820 A.2d 197 (evaluating constitutionality of Vermont's grandparent visitation law in light of *Troxel* and construing statute to preclude court interference with fit parent's presumptively valid right to restrict grandparent visitation).

¶ 15. Nonbiological parentage was last addressed in *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78, 180 Vt. 441, 912 A.2d 951,

---

[5] Notably, two justices dissented in *Titchenal*. The discord between the majority and dissent was not regarding de facto parentage as a jurisdictional basis — neither side supported such a rule. The dissent was in favor of embracing and applying an "equitable-adoption" concept, which would "allow a court to find, in retrospect, an intent to adopt by a person who had never formally done so, for the purpose of achieving a just result." 166 Vt. at 388, 693 A.2d at 691 (Morse, J., dissenting). In any event, the concept as proposed was limited to cases, like in *Titchenal*, "in which a party allegedly failed to adopt because it was not a reasonable legal option. . . . [T]he holding would apply only to those who, like plaintiff, allegedly failed to adopt prior to the 1996 statutory changes in the adoption law," which recognized the right of nonmarried cohabitants to adopt children together. *Id.* at 390, 693 A.2d at 692; 15A V.S.A. § 1-102(a). Defendant here falls outside of any such circumstance.

where we rejected the argument of the birth mother partner in a former civil union that the other partner had no parental rights to a child born to the union through their mutually-agreed-upon artificial insemination. The biological parent relied, in part, upon rebutting the presumption in 15 V.S.A. § 308(4) that a married person is the natural parent of a child born during the marriage. 2006 VT 78, ¶ 42. The presumption applied to civil unions because the parties to a civil union are statutorily entitled to all of the rights of married couples with respect to a child of whom either partner is the natural parent. 15 V.S.A. § 1204(f); see also *id.* § 1204(d) ("The law of domestic relations, including annulment, separation and divorce, child custody and support, and property division and maintenance shall apply to parties to a civil union.").

¶ 16. We concluded, however, that the § 308(4) presumption exclusively related to child support, and that neither the presumption nor its rebuttal was relevant to "the rights of parentage of children born through artificial insemination or to same-sex partners." *Miller-Jenkins*, 2006 VT 78, ¶ 44. Instead, the case was more akin to *Paquette*, insofar as the nonbiological same-sex partner was vested with "at least the status of a stepparent" within her civil union "by virtue of § 1204(d) and (f)." *Id.* ¶¶ 45, 47. Unlike in *Paquette*, we concluded in *Miller-Jenkins* that the nonbiological second parent qualified as a parent on equal footing with the biological mother.

¶ 17. Moreover, the entire rationale behind *Miller-Jenkins* was to address the rights of civil union partners in the express context of their jointly intended artificial insemination. *Id.* ¶¶ 44, 48-52. Among the factors considered by the Court in assigning parentage rights to the nonbiologically-related partner were the parties' legally recognized civil union, their mutual design to expand their family through artificial insemination, their shared active participation in prenatal care and birth, and their co-parenting from the time of conception until their breakup. *Id.* ¶ 56. By virtue of the equal-protection provision in the civil union statute, the factors that would make a husband a parent of a child born from artificial insemination applied equally to the nonbiological partner of a civil union. *Id.*

¶ 18. The dissent characterizes *Miller-Jenkins*, which was hardly cited and barely discussed by defendant, as "closely analogous" and as addressing "the question actually presented here." *Post,* ¶

49. But the differences between *Miller-Jenkins* and the present case far exceed their singular similarity of a now-estranged partner who shared child rearing with the biological mother. In this case, there is no civil union, or any other legally recognized domestic relationship between the parties as in *Miller-Jenkins*. Unlike the child in *Miller-Jenkins*, the children in this case are not the product of mutually-agreed-upon artificial insemination. Perhaps most critically, in this case there is no statutory extension of marital, stepparent or parental rights to the putative nonbiological parent upon which to base a parentage claim. In short, the parental rights recognized in *Miller-Jenkins* were based upon statutory rights of civil union partners, not on any general judicial endorsement of de facto parenthood.

II.

¶ 19. In this appeal, defendant contends that equity provides a jurisdictional basis for de facto parents to petition the family court for custody, parentage and visitation in the absence of a statutory right to do so, and notwithstanding the holding in *Titchenal* that equity confers no jurisdiction in the civil court for such claims. The dissent insists that defendant's claim is a statutory parentage action by which he may assert standing as a "natural parent" entitled to a parentage order under 15 V.S.A. § 302(a).[6] Defendant, however, concedes that, as one who welcomed nonbiological children into his life, he has "no legal remedy."[7] He contends that the best-interests-of-the-child case law is inconsistent with our denial of equity jurisdiction in *Titchenal* to permit consideration of de facto parentage claims, and that developments in family dynamics, demographics, and both foreign and domestic case law since *Titchenal*, militate in favor of departing from that equity ruling.

---

[6] Defendant filled out a standardized parentage complaint form indicating he sought an award of sole parental rights and responsibilities, but did not seek a finding that he was a parent of the children named in the complaint. That this was not a mere oversight in "checking off" some boxes on the form, but not others, is evinced in his accompanying memorandum supporting the custody petition, wherein he never even cited the parentage statute let alone offered an argument that he could or should be considered a "natural parent" under that statute. Rather, he asks the court to award him parental rights and responsibilities under an equitable doctrine of in loco parentis (literally, "in the place of a parent"). Black's Law Dictionary 791 (7th ed. 1999).

[7] Further confirming the unavailability of a legal remedy, defendant posited that if he were more legally sophisticated he would have sought legislative action to afford a "legal opportunity to present his case for visitation."

¶ 20. ■ ■ Thus, defendant's claim is essentially an appeal to equity — particularly given his acknowledgement of the absence of any available remedy at law.[8] *Titchenal*, 166 Vt. at 377, 693 A.2d at 684 ("[A] court may exert its equitable powers to grant appropriate relief only when . . . no adequate legal remedy is available."); *Gerety v. Poitras*, 126 Vt. 153, 155, 224 A.2d 919, 921 (1966) ("Equity will not afford relief where there is a plain, adequate, and complete remedy at law."). For its part, the dissent embarks on statutory construction and case analysis not advanced by defendant, even though this Court ordinarily rejects arguments not raised on appeal.[9] *Mullestein*, 148 Vt. at 175, 531 A.2d at 893.

¶ 21. ■ For the reasons discussed below, we decline defendant's invitation to abandon our reasoning in *Titchenal* and accept a broad de facto parent doctrine, as suggested by defendant, that essentially would allow any former domestic partner to compel a biological parent to defend against the unrelated ex-partner's claim that he or she is a "parent" entitled to judicially enforced

---

[8] Indeed, defendant does not even cite the parentage statute in his brief, let alone make the argument that the phrase "natural parent" may include anybody this Court deems to be a parent under a judicially adopted test. Rather, defendant's entire brief — like much of the dissent's opinion — is aimed at weighing equities in favor of adopting such an equitable doctrine.

[9] We need not address a statutory argument never raised by defendant, but we reject the dissent's suggestion that our opinion is inconsistent with the plain language of Vermont statutory law and the Legislature's intent. As we have noted before, putting aside the limited exception for stepparents, the purpose underlying the parentage statute was to allow putative "biological" fathers "to bring an action to determine paternity" of a child born to unmarried parents. *Lawrence v. Limoge*, 149 Vt. 569, 572, 546 A.2d 802, 804 (1988). This explains the use of the term "natural parent," just as the same term was understood in *B.L.V.B.* to mean a biological parent. See 160 Vt. at 372, 628 A.2d at 1274 (explaining that adoption statute's termination of rights of "natural parents" anticipated that adoption would remove children "from the home of the biological parents, where the biological parents elect or are compelled to terminate their legal obligations to the child"); see also *Jenkins v. Palmer*, 902 F. Supp. 180, 184 (N.D. Iowa 1994) ("[C]ommon usage dictates that the phrase 'natural father' be defined as biological father."), *aff'd in part, vacated in part, and remanded in* 62 F.3d 1083, 1086 (8th Cir. 1995) ("The 'natural' father of a child commonly is understood to mean the child's biological father."); *In re A.A.*, 7 Cal. Rptr. 3d 755, 759 (Ct. App. 2003) ("A natural father is one who has been established as a child's biological father."); *Belsito v. Clark*, 644 N.E.2d 760, 762 (Ohio Ct. Com. Pl. 1994) ("While various terms are used to identify a natural parent, a review of case law leads to the conclusion that 'natural parent' refers to the child and parent being of the same blood or related by blood.").

parental rights and responsibilities.[10] See S. Coupet, *"Ain't I a Parent?": The Exclusion of Kinship Caregivers from the Debate over Expansions of Parenthood*, 34 N.Y.U. Rev. L. & Soc. Change 595, 595-96 (2010) (arguing that de facto parenthood should not be limited to conjugal relationships and advocating for inclusion of kinship caregivers as potential de facto parents). Though ultimately decided on jurisdictional grounds, the reasoning of *Titchenal*, which declined to recognize an equitable basis for jurisdiction over de facto parents, is no less compelling when applied to the same cause of action in family court.

¶ 22. ■ Defendant is in the same position as the de facto parent in *Titchenal*, and equity does not support jurisdiction for a nonparent to assert child custody rights any more here than it did in *Titchenal*. The *Titchenal* Court explained that equitable powers are available "to grant appropriate relief only when a judicially cognizable right exists, and no adequate legal remedy is available. . . . Courts may exert equitable powers based upon common-law, statutory, or constitutional rights, or upon judicial acknowledgement of public-policy considerations establishing an as-yet-unrecognized legal right." 166 Vt. at 377, 693 A.2d at 684. The plaintiff in *Titchenal* was without a statutory or constitutional right to petition the superior court, and so the question became whether common law or public policy considerations required recognition of de facto parents for jurisdictional purposes.

¶ 23. ■ Common law was unavailing in this respect. Vermont follows the "general common-law rule that parents ha[ve] the right to the custody, control, and services of their minor children free from governmental interference." *Id.* at 378, 693 A.2d at 685. We observed that Vermont had no common-law history of interfering with the rights of fit parents absent statutory authorization, with the narrow exception of the state's exercise of parens patriae power to adjudicate dependency or neglect petitions. *Id.*; see also *In re A.D.*, 143 Vt. 432, 435-36, 467 A.2d 121, 124 (1983) (stating that when "the State intervenes in the area of child neglect, it

---

[10] Today's decision neither forecloses nor supports the possibility of an equitable doctrine to determine parentage under specific circumstances, such as where two persons agree to conceive a child through artificial insemination. Cf. *Debra H. v. Janice R.*, 930 N.E.2d 184, 205 (N.Y. 2010) (Smith, J., concurring) (suggesting allowing parental rights for same-sex couples who have a child through artificial insemination while living together, even if not married or joined in civil union).

does so as *parens patriae* to the child" with "a legitimate and compelling interest in the safety and welfare of the child" as well as "maintaining family integrity." (citation omitted)).

¶ 24. Nor were public policy considerations helpful. The *Titchenal* plaintiff and those affected by the decision did not face circumstances "cruel or shocking to the average [person's] conception of justice" as a result of that decision. *Titchenal*, 166 Vt. at 380, 693 A.2d at 686 (alteration in original) (quotation omitted). Partners of heterosexual or same-sex couples could "protect their interests" in potential parentage through existing procedures. *Id.* Heterosexual couples could then and now, as same-sex couples can now, achieve parentage rights through marriage or adoption, and nonbiological parents in same-sex relationships can gain similar assurances through adoption.[11]

¶ 25. ■ As in *Titchenal*, we acknowledge that "there are public-policy considerations that favor allowing third parties claiming a parent-like relationship to seek court-compelled parent-child contact." *Id.* at 385, 693 A.2d at 689. These considerations, however, are still not so persuasive as to compel recognition of a new cause of action, and matching equitable jurisdiction to entertain it, so that acquaintances and partners with less than adoptive or even stepparent status can seek court-compelled visitation with children of persons not legally related to them and against the wishes of their natural parents. As we observed in *Titchenal*, "[g]iven the complex social and practical ramifications of expanding the classes of persons entitled to assert parental rights by seeking custody or visitation, the Legislature is better equipped" to address this issue.[12] *Id.* Deference to the Legislature continues to be prudent "because the laws pertaining to parental rights and responsibilities and parent-child contact have been developed over

---

[11] Today, there are other assurances of parental rights for children born into marriage or civil union. See *Miller-Jenkins*, 2006 VT 78, ¶ 48 (holding presumption of parentage in 15 V.S.A. § 308(4) applies to children born from artificial insemination into marriage or civil union, regardless of biological connection or adoption).

[12] Such ramifications could be far-reaching. Does recognition of a common law or equitable claim for parental contact by unrelated domestic partners include a corresponding right to claim child support from an unrelated but putative de facto parent? Can an unrelated but putative de facto parent then interfere with the biological parent's decision to move away with his or her children? Will every relief-from-abuse proceeding present an avenue for defendant partners to counterattack with de facto parentage complaints?

time solely through legislative enactment or judicial construction of legislative enactments." *Id.*

¶ 26. Essentially, defendant posits that legislative inaction since *Titchenal* in recognizing claims like his should prompt judicial invention of de facto parentage rights. Yet other than citing national and Vermont family demographics statistics that show more children in households with unmarried couples, defendant proffers no equitable consideration requiring this Court to find such jurisdiction where the Legislature has so far declined to extend it. Other courts have declined to fill defendant's perceived vacuum.[13] See *McGuffin v. Overton*, 542 N.W.2d 288, 292 (Mich. Ct. App. 1995) (per curiam) (holding that no generalized third-

---

[13] The dissent repeatedly states that we depart from the modern trend toward judicially created de facto parenthood, but such a "trend" is not universally acknowledged. Even commentators advocating for the establishment or expansion of de facto parenthood recognize that courts around the country, including in recent decisions, are divided — indeed splintered — on this issue. See J. Grossman, *The New Illegitimacy: Tying Parentage to Marital Status for Lesbian Co-Parents*, 20 Am. U. J. Gender Soc. Pol'y & L. 671, 677-79 (2012) (noting that "a few states" grant de facto parents parity to legal parents, and that recognition of de facto parentage "is far from universal," with several states rejecting it outright, including in recent decisions); C. Ball, *Rendering Children Illegitimate in Former Partner Parenting Cases: Hiding Behind the Façade of Certainty*, 20 Am. U. J. Gender Soc. Pol'y & L. 623, 624 (2012) (comparing courts that granted or refused to grant standing for persons seeking parental rights based on de-facto-parentage status). Several courts, including courts of last resort in Maryland in a 2008 decision, New York in a 2010 decision, and Utah in a 2007 decision, have declined to judicially adopt de facto parenthood. See, e.g., *Smith v. Gordon*, 968 A.2d 1, 2-3 (Del. 2009) (superseded by statute) (concluding that person claiming to be de facto parent did not have standing to file petition for custody under relevant section of parentage statute); *Wakeman v. Dixon*, 921 So. 2d 669, 673 (Fla. Dist. Ct. App. 2006) (finding no statutory support for granting visitation or custody to persons claiming de facto parenthood); *Janice M. v. Margaret K.*, 948 A.2d 73, 74-75 (Md. 2008) (holding that de facto parenthood is not recognized in Maryland and concluding that any person who would qualify for such status cannot obtain visitation or custody without demonstrating exceptional circumstances as prerequisite to court's consideration of children's best interests); *White v. White*, 293 S.W.3d 1, 11, 16 (Mo. Ct. App. 2009) (finding no standing to establish parental rights under parentage statute and rejecting equitable de-facto-parent and in-loco-parentis arguments); *Debra H.*, 930 N.E.2d at 192-94 (reaffirming its prior rejection of judicially created de facto parenthood and refusing to exercise its equitable powers to do so absent legislative action); *Jones v. Barlow*, 154 P.3d 808, 815, 819 (Utah 2007) (rejecting judicial adoption of equitable de-facto-parent and in-loco-parentis doctrines to allow former domestic partner to obtain visitation rights); *Stadter v. Siperko*, 661 S.E.2d 494, 499 (Va. Ct. App. 2008) (refusing to adopt by judicial fiat equitable de-facto-parent doctrine).

party standing existed in custody proceeding for party with parent-like relationship because "[t]he Legislature . . . has been very specific in limiting those third persons who may bring an action for custody"); *Alison D. v. Virginia M.*, 572 N.E.2d 27, 29 (N.Y. 1991) (holding that de facto parent did not have standing to pursue visitation with child because domestic relations law "gives *parents* the right to bring proceedings to ensure their proper exercise of their care, custody and control" and "[w]here the Legislature deemed it appropriate, it gave other categories of persons standing to seek visitation . . . in the child's best interests" (emphasis in original) (citations omitted)); *In re Thompson*, 11 S.W.3d 913, 923 (Tenn. Ct. App. 1999) (stating that although "Tennessee's legislature has generally conferred upon parents the right of custody and control of their children, it has not conferred upon" third parties who claim to be de facto parents "any right of visitation." (citation omitted)).

¶ 27. Defendant's remaining arguments in support of recognizing jurisdiction over a claim of de facto parentage rights are unpersuasive. Defendant proposed a four-part test to determine persons qualified as de facto parents and thus eligible to proceed in seeking parent-child contact.[14] Such an approach was considered and rejected in *Titchenal*, insofar as the plaintiff in that case argued that "tests could be created to assure that only those third parties who have developed an intended and shared de facto-parent relationship with a child could petition for visitation." 166 Vt. at 382, 693 A.2d at 687. Indeed, we seriously doubted that the practical ramifications of such a test were workable:

> Although we might recognize new legal rights that would permit the superior court to extend its equitable jurisdiction, jurisdiction should not rest upon a test that in effect would examine the merits of visitation or custody petitions on a case-by-case basis. In reality, such a fact-based test would not be a threshold jurisdictional test, but rather would require a full-blown evidentiary

---

[14] Defendant's test would confer jurisdiction when "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature." *In re Parentage of L.B.*, 122 P.3d 161, 176 (Wash. 2005).

> hearing in most cases. Thus, any such test would not prevent parents from having to defend themselves against the merits of petitions brought by a potentially wide range of third parties claiming a parent-like relationship with their child.

*Id.* at 382, 693 A.2d at 687-88. Thus, *any* live-in member of a household with children would be eligible to plead the foundational facts for parent-child contact and claim family court jurisdiction, irrespective of whether the family court actually determined the person satisfied the requirements of such a test. Defendant's process would require legally recognized parents to answer and defend against third-party claims for child contact or custody at the threshold jurisdictional hearing. While some courts have opened their doors to these claims, we remain disinclined to follow suit absent an imperative from the General Assembly, lest every domestic break-up with children in the household become a potential battleground for child visitation and custody by ex-paramours, or even mere cohabitants.

¶ 28. Vermont .cases before *Titchenal* do not, as defendant argues, presage a different conclusion. Defendant looks to *Paquette v. Paquette* and *Miles v. Farnsworth* to support his jurisdictional claim. The cases are cited out of context, and are inapposite.

¶ 29. Defendant seizes upon dicta in *Paquette* to the effect that "extraordinary circumstances may exist that would justify an award of custody to a nonparent," 146 Vt. at 91, 499 A.2d at 29. But the holding of *Paquette* interpreted a then-existing statutory provision, 15 V.S.A. § 652, which governed custody orders for "any minor *child of the marriage,*" *id.* at 86, 499 A.2d at 26 (emphasis added), as allowing an award of child custody *to a stepparent* if it was "shown by clear and convincing evidence that the natural parent is unfit or that extraordinary circumstances exist to warrant such a custodial order." *Id.* at 92, 499 A.2d at 30. Defendant is not a stepparent by marriage, and thus is not aided by *Paquette.*

¶ 30. We also find unavailing defendant's reliance on *Miles v. Farnsworth*, 121 Vt. 491, 160 A.2d 759 (1960), to support his argument that entirely unrelated third parties may be awarded custody in the absence of statutory authorization. In *Miles,* parties to a divorce stipulated to father's custody of a minor child, provided that the child lived at the home of the paternal grand-

parents. The particular issue on appeal was whether mother demonstrated the necessary change in circumstances to warrant modification of the child custody order. *Id.* at 493, 160 A.2d at 760. The trial court awarded custody to the mother, following her remarriage, based on her and stepfather affording her son an excellent home, training and beneficial influences in the face of the natural father's failure to properly supervise the child. *Id.* at 495, 160 A.2d at 761-62. As to grandmother's interest, the court noted she was "actually a third person to this marriage relationship" and that "[a]s between a mother and a third party the mother must prevail in a custody case, in the absence of compelling reasons to the contrary which are not present here." *Id.* at 495, 160 A.2d at 761. Defendant correctly observes that the Court evaluated the grandmother's love and inevitably waning ability to care for the boy, *id.* at 494, 160 A.2d at 761, but the crux of the case was that mother established a change of circumstances sufficient to alter the custody order. *Id.* at 495, 160 A.2d at 762. To the extent that *Miles* considered third-party rights, it concluded that short of extraordinary circumstances, a mother's rights as a natural parent trumped third-party, and even grandmotherly, interests in the custody of the child. *Id.* at 494-95, 160 A.2d at 761-62. Assuming, for argument only, that *Miles* endorses court-ordered third party child contact in compelling circumstances, and assuming such a ruling could survive a *Troxel* challenge without a showing of parental unfitness, defendant fails to assert either mother's unfitness or exceptional circumstances here.

¶ 31. ██ Defendant seeks support also from Vermont statutes allowing third parties to take custody of children in certain circumstances. The legislation cited, however, concerns disposition, care and maintenance of children by the state child welfare agency "or to some person or suitable institution, as shall be equitable" where a parent is guilty of nonsupport or desertion, 15 V.S.A. §§ 209, 291. It is not at all plain that the statutes convey standing to any person to assert a custody claim, as opposed to authorizing the court to consider placement with a nonparent in dire circumstances. Even assuming, without deciding, that defendant could seek custody as such a person, the predicates of parental desertion or nonsupport are not presented here.[15]

---

[15] The other statute cited by defendant deals with assignment of "parental rights and responsibilities" arising out of annulment and divorce actions. 15 V.S.A. § 665.

¶ 32. Finally, defendant contends that the decisions in *Titchenal* and *O'Connell-Starkey v. Starkey*, 2007 VT 128, 183 Vt. 10, 944 A.2d 897, are inconsistent, allowing the state to force one unrelated person to financially support a child and forbid another unrelated person visitation with a child. Defendant argues that these decisions create a "void in Vermont law that would be properly filled by a decision that allows [defendant] to present evidence that he is the psychological father" of the children in this case. Defendant reads these cases as allowing "for an unmarried man to assume responsibility for a child, thinking it was his, help raise the child, agree to child support after the parties' separation but then be forced to pay child support and lose standing to petition for custody if it was later determined that he was not related." This proposition contorts the case law.

¶ 33. In *Starkey*, the plaintiff gave birth to a child while cohabiting with the defendant. The parties married afterwards and subsequently divorced seven years later. The final divorce decree adopted the parties' stipulation that the child was of the marriage, thereby establishing legal parentage of both the plaintiff and the defendant. Some years later DNA testing revealed a ninety-nine percent probability that the defendant was not the child's father, but the family court approved another stipulated settlement of the parties, which provided that the defendant was responsible for sixty percent of the child's college tuition. Still later, the parties entered another agreement, approved by the family court, that the defendant was not the child's biological father and thus had no legal or physical rights to the child. The agreement made no mention of the earlier order that the defendant was to pay sixty percent of the college tuition.

¶ 34. The defendant challenged his obligation to pay the tuition after the three-month divorce nisi period had run, arguing that he could not "be obligated to support the college education of a child to whom he is not biologically related and for whom he has

This provision calls on the trial court to evaluate parental rights and responsibilities vis-à-vis the best interests of children including their relationships with third parties. 15 V.S.A. § 665(b)(4), (6), (7). Defendant never entered into a legally-recognized spousal relationship with plaintiff; thus the statutes concerning spousal desertion, annulment, and divorce are inapplicable. If anything, defendant's acknowledgement of the lack of a legal relationship in this case lends credence to the proposition that it is within the Legislature's province to legally recognize de facto parents.

relinquished all parental rights and responsibilities." *Starkey*, 2007 VT 128, ¶ 17. Conceding that the final divorce order established parentage, the defendant argued that the agreement memorializing that he was not the child's biological father negated his obligation to pay college tuition under the earlier child support order. *Id.* We rejected this argument because it overlooked the fact that a parentage determination in a divorce decree "is not open to collateral attack in a motion to modify child support. . . . [T]he final divorce order establishes parentage, and unlike parental rights and responsibilities and child support, the family court does not retain jurisdiction of parentage once the nisi period has run." *Id.* ¶ 18.

¶ 35. *Starkey* lends no assistance to defendant because he has no final court order establishing parentage here. Biology is not everything in parent-child contact cases. See, e.g., *Columbia v. Lawton*, 2013 VT 2, ¶ 1, 193 Vt. 165, 71 A.3d 1218 (affirming conclusion that putative natural father lacked standing to proceed with parentage action because court already issued parentage order and constitutional considerations did not require otherwise). Yet, if anything, *Starkey* stands as another example where the basis for parental rights and responsibilities depends upon a *legal connection* to a child. *Starkey* turns on judgment finality against collateral attack and creates no exception, or inconsistency, to our refusal in *Titchenal* to extend jurisdiction to entertain a pseudo-parentage claim independent of any such order or legal relationship.[16]

## III.

¶ 36.  ██  Defendant also challenges the family court's issuance of a final RFA order denying him contact with plaintiff's children.

---

[16] It is noteworthy that defendant's claim is exactly the type of situation *Titchenal* foresaw with disapproval. Defendant reported that during his relationship with plaintiff, they looked into adoption, but did not follow through. Adoption was an option as contemplated in *Titchenal*, albeit, as defendant points out, an expensive and cumbersome one. *Titchenal* specifically rejected a proposal to accept "a wide variety of reasons for failing to adopt — lack of funds or fear of discrimination by the adoption agency, for example" as forming "the basis for the family court's jurisdiction to resolve factual disputes" concerning a nonparent's rights of custody and visitation with a legal parent's child. *Titchenal*, 166 Vt. at 384, 693 A.2d at 689. Other than his clear preference for court intervention, defendant offers no reason why the Legislature is not equipped to consider his position, and its potential policy implications, and fashion a solution if appropriate.

Defendant's brief does not address in any detail the trial court's alleged error in issuing the final RFA order, except to point out that when the trial court checked the box "[d]efendant shall have no contact with the minor children," it included the hand-written note that "[d]efendant is not their biological father." To the extent defendant contests the final RFA order to assert a parentage claim over plaintiff's children, 15 V.S.A. § 1103 is the wrong vehicle. "[T]he abuse prevention statute is aimed at providing immediate relief for abuse victims, not at determining the parties' rights with respect to custody, support or property. . . . Accordingly, custody determinations are better resolved in proceedings concerning divorce, legal separation, parentage, or desertion and support." *Rapp v. Dimino*, 162 Vt. 1, 5, 643 A.2d 835, 837 (1993).

¶ 37. ■ Defendant's more general objection to the RFA order's terms, including the no-contact provision, cannot succeed in light of today's holding that the family court lacks jurisdiction to review a legally unrelated defendant's parentage and custody claims. Review of the issuance of an RFA order, and its terms, is deferential. "In matters of personal relations, such as abuse prevention, the family court is in a unique position to assess the credibility of witnesses and weigh the strength of evidence at hearing." *Raynes v. Rogers*, 2008 VT 52, ¶ 9, 183 Vt. 513, 955 A.2d 1135. Accordingly, this Court reviews "the family court's decision to grant or deny a protective order only for an abuse of discretion, upholding its findings if supported by the evidence and its conclusions if supported by the findings." *Id.*

¶ 38. ■ The RFA order and its terms are supported by the trial court's findings. The trial court found that defendant placed plaintiff and her children in imminent fear of serious physical harm through his back-to-back 2 a.m. forays to plaintiff's residence. The children were present during defendant's repeated early morning bouts of banging on their door. The trial court also found that the supposed goal of these ventures — welfare of the children — could have been accomplished far more reasonably than by appearing on a woman's doorstep at 2 a.m. after ensuring no other man is on the premises. These findings support the RFA order's terms.

*Affirmed.*

¶ 39. **Dooley, J.,** concurring. I joined *Titchenal v. Dexter*, primarily because I agree with this part of the rationale:

Given the complex social and practical ramifications of expanding the classes of persons entitled to assert parental rights by seeking custody or visitation, the Legislature is better equipped to deal with the problem. Deference to the Legislature is particularly appropriate in this arena because the laws pertaining to parental rights and responsibilities and parent-child contact have been developed over time solely through legislative enactment or judicial construction of legislative enactments.

166 Vt. 373, 385, 693 A.2d 682, 689 (1997) (citations omitted). Thus, I agree with the majority opinion's reliance on this aspect of the *Titchenal* reasoning. At the same time, I recognize that *Titchenal* was decided in 1997, over seventeen years ago. We revisited related issues eight years ago in *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78, 180 Vt. 441, 912 A.2d 951. In addressing the rights of a civil-union partner with respect to a child whose birth was the result of the partners' planned artificial insemination, we noted that "the Legislature has not dealt directly with new reproductive technologies and the families that result from those technologies." *Id.* ¶ 52. We "express[ed], as many other courts have, a preference for legislative action, . . . but [concluded that,] in the absence of that action, we must protect the best interests of the child." *Id.*

¶ 40. I admit that I find it more difficult to favor legislative action over judicial action in the face of years of legislative inaction. I can think of no subject that is in greater need of legislative action than this one — defining who may be considered a parent for purposes of determining parental rights and responsibilities and parent-child contact. While I am voting with the majority in this case, our responsibility to protect the best interests of the child will become only more challenging as the changing nature of families presents circumstances that are well outside the contemplation of our now archaic and inadequate statutes. I recognize that there may come a tipping point where judicial action to define rights and responsibilities beyond those of biological parents and marital partners becomes unavoidable. I would rather that the Legislature act before we see that day.

¶ 41. In theory, the Legislature addressed the subject, at least as of 1984, when the Parentage Proceedings Act was adopted. See 15 V.S.A. §§ 301-306. As we pointed out in *Miller-Jenkins*, how-

ever, that very limited statute was enacted primarily to facilitate the establishment of child-support obligations and their collection. See 2006 VT 78, ¶ 44 ("We have examined the legislative history of the statute and can find no indication that it was intended to govern the rights of parentage of children born through artificial insemination or to same-sex partners, or to do anything other than provide a speedy recovery of child support."). Except in a wholly perfunctory manner, the Act failed to address parental rights and responsibilities, or rights and responsibilities of others with respect to children beyond its child support purpose.

¶ 42. The Legislature has not adopted the Uniform Parentage Act of 1973, 9B U.L.A. 386 (2001), which would have addressed issues beyond child support. Nor has the Legislature adopted the Uniform Parentage Act of 2000, 9B U.L.A. 299 (2001), as amended in 2002. The more recent versions are important because they particularly address a child of assisted reproduction and gestational agreements, as well as some of the other issues that have arisen as the result of changing family structures. In addition to the approach taken by the Uniform Parentage Act, other courts, including one of the out-of-state decisions cited by the majority, *Debra H. v. Janice R.*, 930 N.E.2d 184 (N.Y. 2010), have analyzed statutes from other jurisdictions that address precisely the issues presented here. See *id.* at 193-94.

¶ 43. My purpose in noting various legislative alternatives is not to endorse any of them, but instead to point out that models exist for a thorough airing of the issues and alternatives. I do not suggest that drafting and enacting such legislation will be easy. Undeniably, it would involve complex and difficult policy choices based on an in-depth understanding of the composition of present-day and future families. It is for this very reason that I urge the Legislature to act, and to act with some urgency so that an archaic legal system does not create uncertainty for families and children and inflict real harm on them.

¶ 44. **Robinson, J.,** dissenting. Although I acknowledge that father presents this case as a challenge to *Titchenal*, I do not believe that the question actually raised by this case is whether "equity provides a jurisdictional basis for de facto parents to petition the family court for custody, parentage and visitation in the absence of a statutory right to do so, and notwithstanding the holding in *Titchenal* that equity confers no jurisdiction in the civil

court for such claims." See *ante*, ¶ 19. Nor do I believe that the question in this case is whether a third-party nonparent is entitled to parent-like rights such as parent-child contact. See *ante*, ¶¶ 22-26. Notwithstanding father's invocation of equity, this is a statutory parentage action, and the majority's opinion accordingly expands the reach of the *Titchenal* decision well beyond the basis upon which it was decided, directing Vermont's decisional law squarely away from the modern trend.

¶ 45. The core holding in *Titchenal* was that, in the absence of a statutory basis for doing so, the superior court, which did not even have statutory authority to decide ordinary cases concerning custody and visitation at the time *Titchenal* was decided, could not invoke its general equitable powers to assign a nonparent parent-like rights. *Titchenal v. Dexter*, 166 Vt. 373, 377, 693 A.2d 682, 684 (1997). The putative parent in that case did not bring a statutory parentage action; she essentially asked the superior court, as the court of general jurisdiction at the time, to invoke its general equitable authority to protect a long-established functional parent-child bond. This Court had no interest in carving out a new basis for civil court jurisdiction in order to develop a jurisprudence of equitable parenthood; in rejecting the putative mother's petition, it relied heavily on the fact that she was not basing her claim on an established statutory source. The Court explained:

> [U]nder the scheme advocated by plaintiff and amicus curiae, the family court would adjudicate disputes concerning parental rights and responsibilities and parent-child contact within the parameters and criteria set forth in statutory divorce, parentage, dependency and neglect, nonsupport and separation, relief-from-abuse, and at times guardianship and adoption proceedings, while the superior court would exert its equitable powers to consider such disputes arising outside these statutory proceedings.
>
> We find no legal basis for plaintiff's proposal. Courts cannot exert equitable powers unless they first have jurisdiction over the subject matter and parties.

*Id.* at 376-77, 693 A.2d at 684 (citations omitted); see also *id.* at 376 n.2, 693 A.2d at 684 n.2 ("Regardless of whether we view parent-child contact (visitation) as a limited form of parental rights and responsibilities (custody) or as a limitation upon

another's parental rights and responsibilities, such rights may be granted only in a jurisdictionally sound custody proceeding."); *id.* at 377-78, 693 A.2d at 684-85 (finding no underlying legal basis for plaintiff's claim that would allow the superior court to apply its equitable powers to adjudicate her claim); *id.* at 378-79, 693 A.2d at 685 (distinguishing the custody-related cases cited by plaintiff and amicus curiae because they "involve decisions made within the context of statutory proceedings"). Although this Court undeniably expressed skepticism about the concept of a "de facto" parent in the *Titchenal* opinion, the decision turned on the procedural and jurisdictional posture of the case. This conclusion is not only supported by a reading of *Titchenal* itself; as set forth more fully below, it is the only reading of *Titchenal* that is compatible with this Court's subsequent opinions.

¶ 46. In marked contrast to the putative mother in *Titchenal*, defendant here did not file an equitable claim in a court of general jurisdiction; instead, he filed a statutory parentage action in the family court — a claim that is not subject to the analysis of equity and jurisdiction that drove this Court's decision in *Titchenal* and that does not require us to revisit or overrule our holding in *Titchenal*. Moreover, defendant's statutory parentage claim does not raise the question of whether defendant, as a legal stranger to the children, is entitled to contact with them on the basis of his longstanding relationship.[17] Instead, it raises an entirely distinct legal issue: is defendant, the putative parent in this parentage action, the children's legal parent? This is the same threshold question raised in any parentage action.[18] What makes it complicated here is that the putative father in this case was concededly never married to the children's legal parent, and he does not assert a biological connection to the children. Neither

---

[17] Accordingly, cases like *Troxel v. Granville*, 530 U.S. 57 (2000), dealing with grandparent visitation, are inapposite. Defendant here is not requesting contact with the children even though he is *not* their parent; by filing a parentage action, he is asserting that he *is* their parent.

[18] I focus on the parentage action because that matter determines the threshold question of whether defendant is the legally recognized parent of either or both of these children. If he is, the trial court may nonetheless deny him parental rights and responsibilities and curtail or even deny him parent-child contact in the context of the relief-from-abuse case or the parentage case if such an order is supported by competent evidence concerning the children's best interests and defendant's parental fitness. But it may not base its decision on the ground that he is not the children's legal parent.

*Titchenal* nor other cases in which a third party nonparent has sought contact with a child definitively answers the question of whether Vermont's parentage statute authorizes a parentage claim under these circumstances. The question presented in this case is not whether equity provides a jurisdictional basis for defendant's claim; it is whether and under what circumstances Vermont's parentage statute, 15 V.S.A. §§ 301-306, permits a determination of parentage when a putative parent is neither married to a child's legally-recognized parent, nor biologically related to that parent.[19]

¶ 47. Although a biological connection with a child and marriage to a child's parent at the time of the child's birth are both significant factors supporting a finding of parentage, a review of our case law, applicable statutes, and decisions from other states makes it clear that these factors are not always necessary to establish parentage. This case calls upon this Court to elaborate on the parameters of legal parenthood, and to apply that analysis, in the context of a motion to dismiss, to a fact pattern that is not squarely resolved by any prior decisions of this Court.[20]

I.

¶ 48. The majority's implicit answer to the central question in this case is based on a reinterpretation of this Court's existing precedents on the subject, including decisions far more recent than *Titchenal*; is inconsistent with the language and structure of the parentage statute as well as Vermont's statutes more broadly; undermines the expressed intent of the Legislature; and drives Vermont law in a direction squarely at odds with the modern trend in other jurisdictions.

---

[19] I use the term "biological" because this is the term this Court, and many other courts, have commonly used. I recognize that this more general term arguably encompasses two different kinds of relationship: genetic and gestational. In most cases, a gestational parent — the parent who gives birth to a child — is also a genetic parent of a child, but in cases in which a gestational parent carries another's egg, that may not be the case. In this case, it is defendant's lack of genetic connection with the children, not the fact that he did not bear them, that presents the potential obstacle to his parentage claim.

[20] We consider this case on appeal from the trial court's dismissal of defendant's claim based on the pleadings. He has not yet had an opportunity to present the evidence supporting his claim of parentage. The only question before us today is whether, based on his allegations, he might *possibly* be able to prove parentage notwithstanding his lack of biological connection to the children and the fact that he was not married to their mother when either of them was born.

## A.

¶ 49. This Court recently addressed the question actually presented here in a closely analogous case. *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78, 180 Vt. 441, 912 A.2d 951. Lisa and Janet Miller-Jenkins lived together in Virginia for several years in the late 1990s and early 2000s. During that time, they traveled to Vermont and joined in a civil union. After that, back in Virginia, they planned to have and raise a child together. Lisa carried the child, conceived with sperm from an anonymous donor that they selected together, and Janet was present in the delivery room when the child was born. Several months after the child's birth, they moved their family to Vermont. Lisa and Janet separated about a year later, and Lisa moved back to Virginia with the child. Lisa filed for civil union dissolution in Vermont, and consistent with Lisa's request, the court awarded her temporary legal and physical rights and responsibilities for the minor child, with Janet exercising specified parent-child contact. *Id.* ¶ 4. Shortly after that order, Lisa stopped allowing Janet to have contact with their child and filed a parentage action in Virginia, initiating an interstate jurisdictional struggle between Vermont and Virginia courts concerning Janet's parental status and rights and obligations. The Vermont court recognized Janet's status as a legal parent of the child, and the Virginia court denied it. *Id.* ¶¶ 5-8. After several orders by both courts, this Court heard the case on appeal. Much of this Court's opinion focused on the interstate jurisdictional issues, but this Court also addressed the validity of the Vermont trial court's parentage determination. *Id.* ¶ 41.

¶ 50. Lisa pointed to the parentage statute — in particular its use of the term "natural parent" and the presumptions embedded in that statute — and argued that the statute demonstrated that a nonbiological putative parent in Janet's shoes could not be a legally recognized parent. This Court concluded that the parentage statute does not purport to answer the question of who is a parent, and rejected the suggestion that the use of the term "natural" in the parentage statute reflects a "legislative intent that only biological parents can be parents for the purposes of the parentage statute." *Id.* ¶ 54. The Court explained:

> We find this to be an overly broad reading of the language. The parentage act does not include a definition of "parent." It does not state that only a natural parent

is a parent for purposes of the statute. In fact, the statute is primarily procedural, *leaving it to the courts to define who is a parent for purposes of a parentage adjudication.* Given its origin and history, it is far more likely that the legislative purpose was to allow for summary child support adjudication in cases where biological parenthood is almost indisputable.

*Id.* (emphasis added).

¶ 51. Examining the parentage statute more broadly, this Court expressly rejected the suggestion that the inapplicability of any of the listed statutory presumptions regarding parentage doomed Janet's parentage claim: "Where the presumption cannot apply, it does not mean the individual is not a parent; it simply means we must look to see whether parentage exists without the use of the presumption." *Id.* ¶ 53. Accordingly, this Court considered "the ultimate question" of whether Janet was a parent within the meaning of the parentage statute without consideration of the presumptions reflected in that law. *Id.* ¶ 55. This Court explained, "We have held that the term 'parent' is specific to the context of the family involved." *Id.*; see also *Columbia v. Lawton*, 2013 VT 2, ¶ 29, 193 Vt. 165, 71 A.3d 1218 ("The determination of an individual's status, or potential status, as a parent requires consideration of a host of factors, including but not limited to a child's genetic connection, or lack thereof, to a putative parent.").

¶ 52. In *Miller-Jenkins*, this Court listed various considerations in support of its determination that Janet was a legal parent of the child, including, "first and foremost," that Janet and Lisa were in a valid legal union at the time of the child's birth. 2006 VT 78, ¶ 56. However, the Court did not rest its conclusion on that factor. Instead, the Court recognized the following other factors as relevant to its conclusion:

It was the expectation and intent of both Lisa and Janet that Janet would be IMJ's parent. Janet participated in the decision that Lisa would be artificially inseminated to bear a child and participated actively in the prenatal care and birth. Both Lisa and Janet treated Janet as IMJ's parent during the time they resided together, and Lisa identified Janet as a parent of IMJ in the dissolution petition. Finally, there is no other claimant to the status of parent, and, as a result, a negative decision would leave IMJ with only one parent.

*Id.* Although the fact that the parties had jointly decided to have a child using donor insemination, and the fact that they were joined in civil union at the time of the child's birth, were both obviously central to the analysis, this Court specifically declined to say which factors were essential or dispositive:

> This is not a close case under the precedents from other states. Because so many factors are present in this case that allow us to hold that the nonbiologically-related partner is the child's parent, we need not address which factors may be dispositive on the issue in a closer case.

*Id.* ¶ 58.[21]

¶ 53. In *Miller-Jenkins*, this Court recognized that the Legislature has left the task of defining the contours of parenthood to us, and identified a host of factors other than biology and a legal relationship with an acknowledged parent as relevant to the question of who is a parent. The majority in this case now rewrites and significantly narrows these conclusions, suggesting that the *Miller-Jenkins* decision hinged narrowly on the legal connection, in the form of a civil union, between the putative mother and the birth mother. *Ante*, ¶ 17. The implication of the majority's analysis is that if faced with facts identical to those presented in *Miller-Jenkins*, except with parents who were not joined in a legally recognized status at the time the child was conceived, this Court could deny the nonbiological mother's claim out of hand. That is the very implication this Court took pains to avoid in *Miller-Jenkins* by relying on the parties' civil union as a persuasive, but not necessary or dispositive, factor. In the name of upholding one precedent — *Titchenal* — the majority has expanded that decision's reach while reinterpreting and dramatically scaling back a more recent and relevant one.

## B.

¶ 54. This Court's suggestion in *Miller-Jenkins* that the legal status of "parent" can arise from a range of factors, and is not necessarily dependent upon a biological connection or a legal relationship between putative parent and birth parent, is entirely

---

[21] The majority reinterprets the *Miller-Jenkins* holding, suggesting that it rests on the presumption of parentage applicable to the spouse, whether through marriage or civil union, of a biological parent, and/or the fact that the mothers planned together to conceive the child through donor insemination. *Ante*, ¶¶ 15-18.

consistent with the language and structure of Vermont's parentage statute. See *Russell v. Armitage*, 166 Vt. 392, 403, 697 A.2d 630, 637 (1997) ("Our goal in interpreting statutes is to effect the intent of the Legislature, which we attempt to discern first by looking to the language of the statute."). That statute provides: "An action to establish parentage in cases where parentage has not been previously determined either by an action under this subchapter or by adoption, may be brought by . . . a person alleged or alleging himself or herself to be the natural parent of a child . . . ." 15 V.S.A. § 302(a).

¶ 55. A fuller examination of the parentage statute as a whole buttresses our conclusion in *Miller-Jenkins* that the statute as a whole does not answer the question of who qualifies to be a legal parent, and that a biological connection with a child's parent at the time of birth is not indispensable to a parentage claim. See *Ran-Mar, Inc. v. Town of Berlin*, 2006 VT 117, ¶ 5, 181 Vt. 26, 912 A.2d 984 (stating that "[w]e construe all parts of the statutory scheme together, where possible, as a harmonious whole").

¶ 56. On the one hand, the statute provides for the conduct of genetic tests in connection with a claim of parentage. See, e.g., 15 V.S.A. § 304(a) ("On motion of a party, the court shall require the child, the defendant or defendants, and any acknowledged parent to submit to appropriate genetic testing for the determination of parentage."). On the other hand, the statute states that "[t]he results of genetic testing are *relevant* to proceedings under this chapter in order to prove parentage or to disprove parentage." 15 V.S.A. § 304(b) (emphasis added). If a putative parent's claim to parentage rose or fell on the question of genetic connection, the Legislature would have indicated that a genetic match between putative parent and child, or the lack thereof, was *dispositive* on the question of parentage. Instead, the Legislature has made it clear that the result of genetic testing, while clearly a factor in the mix, does not necessarily, in and of itself, prove or disprove parentage.

¶ 57. Finally, the statute's presumptions concerning parentage — which, as we concluded in *Miller-Jenkins*, are evidentiary presumptions that affect burdens of production but do not collectively frame a comprehensive definition of who is or is not a legal parent — may potentially point in conflicting directions in a given case. For example, one can imagine a case in which one putative parent declines to submit to genetic testing, another is established

by genetic testing as more than 98% likely to be the biological parent, another was married to the mother at the time of the child's birth, and yet another signed an acknowledgment of parentage. Under the statute, each of these putative parents would be subject to a presumption of parentage. See 15 V.S.A. § 308. This fact reinforces our conclusion in *Miller-Jenkins* that the statutory presumptions laid out in our parentage statute are evidentiary guides that streamline parentage actions in the vast majority of ordinary cases, but do not purport to collectively establish the legally essential feature or features of parenthood.

## C.

¶ 58. This understanding of the parentage statute is also consistent with the intent underlying the statute. This Court has previously emphasized that in construing statutes, "[w]e must look 'not only at the letter of a statute but also its reason and spirit.' " *In re B.L.V.B.*, 160 Vt. 368, 371, 628 A.2d 1271, 1273 (1993) (quoting *In re S.B.L.*, 150 Vt. 294, 301, 553 A.2d 1078, 1083 (1988)). In *B.L.V.B.* this Court considered whether an unmarried committed same-sex partner of a parent could adopt that parent's child without terminating the initial parent's legal rights to the child. The relevant statute only allowed stepparent adoptions — adoptions that allow a stepparent to become a legal parent without terminating a child's existing legal parent's rights — "when the adoption is made by a spouse of a natural parent." 160 Vt. at 370, 628 A.2d at 1273. B.L.V.B.'s nonbiological mother could not at the time legally marry his biological mother, and the notion that same-sex couples might qualify as spouses was at odds with the established understanding of that term at the time. See, e.g., *Baker v. State*, 170 Vt. 194, 199, 744 A.2d 864, 868 (1999) ("Although it is not necessarily the only possible definition, there is no doubt that the plain and ordinary meaning of 'marriage' is the union of one man and one woman as husband and wife."). Notwithstanding the arguably clear language of the statute, this Court looked beyond the text of the statute to its underlying intent. Concluding that "[t]he intent of the [L]egislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents," this Court rejected a literal interpretation of the statute as inconsistent with the best interests of the children the statute sought to protect. *In*

*re B.L.V.B.*, 160 Vt. at 373, 744 A.2d at 1274. The Court authorized the stepparent adoption by the child's nonbiological mother.

¶ 59. *B.L.V.B.* is not directly determinative of the issues before us today. However, this Court's approach to interpreting and applying the adoption statute — one that emphasizes our responsibility to give effect to the Legislature's intent to protect children by establishing and preserving their legal relationships with their parents — resonates in the present case. The Legislature expressly codified its child-centered goals in enacting the Parentage Proceedings Act:

> It is the policy of this state that the legal rights, privileges, duties, and obligations of parents be established for the benefit of all children, regardless of whether the child is born during civil marriage or out of wedlock.

15 V.S.A. § 301. Like the adoption statute, the parentage statute is designed to "protect the security of family units," by, in the case of the parentage statute, defining the legal rights and responsibilities for children whose parents are not automatically recognized by operation of law. *In re B.L.V.B.*, 160 Vt. at 373, 744 A.2d at 1274. The Legislature's statement of purpose does not limit the statute's goals to the recognition of biological parent-child relationships, and the best interests of children would not logically call for such a limitation. Children with a nonbiological connection to a parent have just as much of a need for recognition of their established relationship with the other as those who were adopted by one parent in *B.L.V.B.* See *Chatterjee v. King*, 2012-NMSC-019, ¶ 37, 280 P.3d 283 ("[T]he child's best interests are served when intending parents physically, emotionally, and financially support the child from the time the child comes into their lives."); *Middleton v. Johnson*, 633 S.E.2d 162, 169 (S.C. Ct. App. 2006) ("[T]he finding of the existence of [the parent-child] bond reflects that the singular emotional and spiritual connection, ordinarily only expected in the relationship of a legal parent and child, has been created between an adult and child who have neither blood nor adoption between them." (quotations omitted)).

### D.

¶ 60. This Court's previous recognition that in some cases individuals with neither a biological connection to a child nor a

legal relationship to the child's parent may have parental rights is consistent with the modern trend. The procedural and jurisdictional foundations for recognizing the parental rights of such parents vary widely, and the consequences of such a finding are not uniform. (For example, in some states "de facto" parents stand in parity with biological parents, whereas in some, they are entitled to visitation but not necessarily custody.) Nonetheless, in recent years a host of state courts and legislatures have embraced the principle that in limited and well-defined circumstances a person who has fully engaged as a child's parent may have parental rights and obligations despite the lack of biological connection or legal ties to a child's other parent, and even if the child's other parent is fit. See, e.g., *In re Custody of C.C.R.S.*, 892 P.2d 246, 257 (Colo. 1995) ("[T]he best interests of the child standard is the prevailing determination in a custody contest between biological parents and psychological parents."); *Smith v. Guest*, 16 A.3d 920, 936 (Del. 2011) (affirming award of joint custody to adoptive mother's former partner pursuant to statute authorizing award of custody to de facto parents); *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 892 (Mass. 1999) (recognizing visitation rights of de facto parent who had resided with the child and, with the consent and encouragement of the legal parent, had performed a share of caretaking functions at least as great as the legal parent); *C.E.W. v. D.E.W.*, 2004 ME 43, ¶ 15, 845 A.2d 1146 (holding that nonbiological mother whose rights sprang from her status as the child's coparent throughout her life stood in parity with the biological mother for the purpose of a custody determination); *V.C. v. M.J.B.*, 748 A.2d 539 (N.J. 2000) (discussed below); *Chatterjee*, 2012-NMSC-019, ¶ 37 (construing statute to allow woman "to establish a natural parent and child relationship with a child whom she has held out as her natural child from the moment the child came into the lives of both the adoptive mother and the presumptive mother"); *Mason v. Dwinnell*, 660 S.E.2d 58, 73 (N.C. Ct. App. 2008) (affirming award of joint custody to parent who gave birth to child and her former domestic partner who coparented the child from birth); *Brooks v. Fair*, 532 N.E.2d 208, 212-13 (Ohio Ct. App. 1988) (holding that where, with husband's consent, mother conceived using reproductive technologies, and husband nurtured the child and held her out as his own, court would not find that husband was not the father even though he was not the child's biological parent (cited approvingly in

*Miller-Jenkins*, 2006 VT 78, ¶ 57)); *T.B. v. L.R.M.*, 786 A.2d 913, 920 (Pa. 2001) (affirming award of partial custody and visitation to legal mother's former domestic partner who acted in parental capacity); *Rubano v. DiCenzo*, 759 A.2d 959, 975 (R.I. 2000) ("[A] person who has no biological connection to a child but who has served as a psychological or de facto parent to that child may, under [limited circumstances], establish his or her entitlement to parental rights vis-à-vis the child."); *Middleton v. Johnson*, 633 S.E.2d 162, 167-70 (S.C. Ct. App. 2006) (holding that mother's ex-boyfriend had standing to seek visitation where, for nearly ten years, mother had fostered a parent-child relationship between ex-boyfriend and child and had ceded a large part of her parental responsibility to him, including having child live with ex-boyfriend about half the time, and ex-boyfriend had functioned as child's parent); *In re Parentage of L.B.*, 122 P.3d 161 (Wash. 2005) (discussed more fully below); *In re Clifford K.*, 619 S.E.2d 138, 156-57 (W. Va. 2005) (recognizing that "psychological parent" has greater rights in a custody proceeding than would ordinarily be afforded a person who is neither the biological nor adoptive parent of a child); *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis. 1995).[22]

¶ 61. The majority's reinterpretation of *Miller-Jenkins* and expansion of this Court's prior holding in *Titchenal* not only conflicts with the language, structure and intent of the parentage statute, but places Vermont outside of the modern trend in family law that recognizes that biological connection and/or legal relationship to a child's legal parent are significant but not always essential factors in the parentage determination.

## II.

¶ 62. Having recognized that the Legislature has left it to this Court to articulate a framework for defining parenthood, this Court's task in this case is to determine what factors, if any, are necessary to a claim of parentage. If no single factor, or collection of factors, is dispositive, what factors are relevant to the consideration, and what is their relative weight?

---

[22] The American Law Institute has likewise recognized that parental rights can arise from intentions and conduct, rather than biology or legal ties. Am. L. Inst., Principles of the Law of Family Dissolution § 2.03 (2002).

## A.

¶ 63. As set forth above, our case law makes it clear that a biological connection between parent and child is not a necessary prerequisite to parental status. See, e.g., *Columbia*, 2013 VT 2, ¶ 29 n.2 (explaining that genetic connection with child is neither necessary nor sufficient to establish parentage). However, the fact of a biological connection is undoubtedly relevant to the parentage analysis because, as we have recognized, "[a] biological connection . . . creates the *opportunity* to establish a parent-child relationship, but is not, by itself, tantamount to parenthood." *Id.* ¶ 23; see also 15 V.S.A. § 304(b) (results of a genetic test relevant to determination of parentage).

¶ 64. Moreover, we have said that a formal legal relationship between a putative parent and a child's legally recognized parent at the time of birth is an "extremely persuasive" factor supporting parentage. *Miller-Jenkins*, 2006 VT 78, ¶ 58; see also 15 V.S.A. § 308(4); 15 V.S.A. § 1204(f).

¶ 65. We have also recognized that the presence of an established parent-child relationship — not merely a close bond, but a relationship understood by the parent and child as a parent-child relationship — can be a significant and in some cases overriding factor in the analysis. In *Godin v. Godin*, this Court considered a post-judgment motion in a divorce case in which an adjudicated father sought genetic testing because rumors within the family had caused him to suspect that the child he had raised during the marriage was not his biological offspring. 168 Vt. 514, 725 A.2d 904 (1998). Although this Court's affirmance of the trial court's refusal to reopen the final divorce order that adjudicated the father's parentage was based primarily on considerations of finality, this Court acknowledged the significance of an established parent-child relationship, even in the absence of a biological connection: "Although we understand plaintiff's interest in ascertaining the true genetic makeup of the child, we agree with the many jurisdictions holding that the financial and emotional welfare of the child, and the preservation of an established parent-child relationship, must remain paramount." *Id.* at 523, 725 A.2d at 910. Noting that the adjudicated father had raised the child as his own for fourteen years — eight during the marriage, and six as a noncustodial parent thereafter — this Court wrote, "It is thus readily apparent that a parent-child relationship was formed, and

it is that relationship, and not the results of a genetic test, that must control." *Id.* at 524, 725 A.2d at 911.

¶ 66. We have likewise found a closely related factor — the extent to which a putative parent has assumed and exercised the responsibilities of parenthood — relevant to the analysis. In *Columbia*, we concluded that the fact that the putative father had made no efforts to "take responsibility for the child by establishing a relationship, providing nurturing, offering support, or asserting his legal rights" undermined his parentage claim, even in the face of a potential biological link. *Columbia*, 2013 VT 2, ¶ 28. Although we pointed to the putative father's failure to assume the mantle of parenthood as a factor undermining his claim to parentage, our holding cut both ways. In denying that putative biological father's request for a genetic test, we implicitly affirmed the parental status of a father who had acknowledged parenthood, accepted the responsibilities of parenting, and raised the child as his own for several years prior to the parentage adjudication — notwithstanding the fact that he was not married to the child's mother, and even assuming for the purposes of our analysis that he was not genetically connected to the child. *Id.* ¶ 2.

¶ 67. Relatedly, we have considered the parties' intentions and expectations as important factors in discerning who is a parent. See *Miller-Jenkins*, 2006 VT 78, ¶ 57 ("We adopt the result in this case as a matter of policy, and to implement the intent of the parties."). In addition to the parties' shared intention at the time of a child's conception, we have considered their actions and representations to the broader world in raising the child. See, e.g., *id.* ¶ 56 (considering fact that both Lisa and Janet treated Janet as child's parent prior to their break-up as a relevant factor in the parentage analysis); *Godin*, 168 Vt. at 523, 725 A.2d at 910 ("Where the presumptive father has held himself out as the child's parent, and engaged in an ongoing parent-child relationship for a period of years, he may not disavow that relationship and destroy a child's long-held assumptions . . . .").

¶ 68. Finally, we have pointed to the presence or absence of a competing claimant for parental status as a factor in the analysis. See, e.g., *Miller-Jenkins*, 2006 VT 78, ¶ 56 ("Finally, there is no other claimant to the status of parent, and, as a result, a negative decision would leave [the child] with only one parent."); *Godin*, 168 Vt. at 524 n.3, 725 A.2d at 911 n.3 (noting that a finding in favor of the parent seeking to disavow his parentage would leave the

child without the benefit of a second parent, and the associated economic and emotional well-being).

## B.

¶ 69. These factors are not inconsistent with factors identified by other jurisdictions as bearing on the question of who qualifies as a parent. Most if not all of the tests applied by the various courts in the out-of-state cases cited above revolve around common themes. Many of these cases use the terms "de facto parent" or "psychological parent" to describe a parent whose legal relationship with a child derives from the intentions and actions of the parents, a parent's assumption of parental duties and relations for an extended period of time, and/or the formation of a significant parent-child bond. Although this Court has rejected a claim of de facto parenthood in the context of an equitable action in the then-superior court, see *Titchenal*, 166 Vt. at 389-90, 693 A.2d at 692, the considerations other courts have relied upon in determining who qualifies for parental recognition under their own laws in the absence of adoption or biological connection are helpful to this Court's task of determining who qualifies as a parent under Vermont's parentage statute. The Washington Supreme Court has adopted the most common test, first articulated by the Wisconsin Supreme Court:

> To establish standing as a *de facto* parent we adopt the following criteria . . . : (1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. In addition, recognition of a *de facto* parent is limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.

*In re L.B.*, 122 P.3d 161, ¶ 40 (quotation and citation omitted); see also *In re Custody of H.S.H.-K.*, 533 N.W.2d at 421. A parent in the state of Washington who satisfies these criteria stands in the same shoes as any other legally recognized parent, whether

biological, adoptive, or otherwise.[23] *In re L.B.*, 122 P.3d 161, ¶ 41. Although this Court has not framed its analysis in a specific multi-part test like that set forth above, the factors embedded in the Washington court's parentage analysis echo the factors this Court has previously relied upon in *Godin, Miller-Jenkins*, and *Columbia*.

¶ 70. Similarly, the New Jersey Supreme Court concluded that in some cases a parent who is neither biologically related to a child, nor legally joined with the child's recognized parent at the time of the child's birth, may acquire the rights and responsibilities of legal parenthood for that child. *V.C. v. M.J.B.*, 748 A.2d at 555. In that case, a lesbian couple raised twins conceived through donor insemination for two years before breaking up. They did not go through a second-parent adoption to secure the legal rights and obligations of the nonbiological mother. However, the biological mother "fostered and cultivated, in every way, the development of a parent-child bond between [the nonbiological mother] and the twins." *Id.* In particular, "they all lived together in the same household as a family; . . . [the nonbiological mother] assumed many of the day-to-day obligations of parenthood toward the twins, including financial support; and . . . a bonded relationship developed between [the nonbiological mother] and the twins that [was] parental in nature." *Id.* The court concluded that in the contest between the mothers with respect to custody and visitation, "the legal paradigm is that of two legal parents and the standard to be applied is the best interests of the child." *Id.*

¶ 71. Although that court's jurisprudential path to this conclusion is different from the route applicable in this case — the New Jersey Supreme Court relied upon the "psychological parent" branch of its "exceptional circumstance" case law, *id.* at 549-50 — the court's reasoning reinforces the considerations set forth above. Like the Washington Supreme Court in the case of *In re L.B.*, the New Jersey court embraced the test first laid out by the

---

[23] The source of the Washington court's authority to award custody or visitation to the nonbiological, nonadoptive parents was different than the source of the family court's authority in this case — Washington State's common law recognized "the significance of parent-child relationships that may otherwise lack statutory recognition" and authorized the extension of parental status to nonbiological, nonadoptive parents, *In re L.B.*, 122 P.3d 161, ¶ 20, whereas defendant's claim here is based on Vermont's parentage statute which leaves the central status of "parent" undefined. Nevertheless, the factors woven into the Washington court's analysis apply in this context as well.

Wisconsin Supreme Court. *Id.* at 551 (citing *In re Custody of H.S.H.-K.*, 533 N.W.2d at 419). The New Jersey court elaborated on the Wisconsin test in several critical ways. With respect to the first prong, the legal parent's fostering or consenting to the parental relationship, the New Jersey Supreme Court noted:

> Obviously, the notion of consent will have different implications in different factual settings. For example, where a legal parent voluntarily absents herself physically or emotionally from her child or is incapable of performing her parental duties, those circumstances may constitute consent to the parental role of a third party who steps into her shoes relative to the child.

*Id.* at 552 n.6.

¶ 72. Moreover, the court explained that, although a putative parent's participation in the decision to have a child is probative of the parties' intentions, such participation is not essential to a finding of legal parenthood:

> Such circumstances parallel the situation in which a woman, already pregnant or a mother, becomes involved with or marries a man who is not the biological or adoptive father of the child, but thereafter fully functions in every respect as a father. There is nothing about that scenario that would justify precluding the possibility of denominating that person as a psychological parent. It goes without saying that adoption proceedings in these circumstances would eliminate the need for a psychological parent inquiry altogether and would be preferable to court intervention. However, the failure of the parties to pursue that option is not preclusive of a finding of psychological parenthood where all the other indicia of that status are present.

*Id.* at 553.[24] Finally, the court explained that "the right of the legal parent does not extend to erasing a relationship between her partner and her child which she voluntarily created and actively

---

[24] The scenario described here parallels the circumstances of the adjudicated father whose rights were challenged by the putative biological father in the case of *Columbia v. Lawton*, in which we implicitly affirmed the adjudicated father's parental status in derogation of that of the claimed biological father. *Columbia*, 2013 VT 2, ¶ 2.

fostered simply because after the parties' separation she regretted having done so." *Id.* at 552 (quotation omitted).

¶ 73. The New Jersey Supreme Court's decision recognizing the parental rights of a nonbiological parent who, with the biological parent's consent and participation, assumed the full range of parental responsibilities and held herself out as the child's parent, is not exceptional. The Supreme Judicial Court of Maine has likewise recognized the full parental status of a putative parent who acted in a parental capacity throughout a child's life in *C.E.W. v. D.E.W.*, 2004 ME 43. The issue in that case was whether the nonbiological mother whose rights sprang from her status as the child's coparent throughout her life stood in parity with the biological mother for the purpose of a custody determination. The court affirmed that she did. *Id.* ¶ 11. With respect to the question of the underlying qualifications for such a parental status, the court said, "However this term is ultimately defined as it is fleshed out by the Legislature or the courts in the future, it must surely be limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life." *Id.* ¶ 14.[25]

¶ 74. The West Virginia Supreme Court similarly defined what it called "a psychological parent," whose relationship with a child is subject to greater protection in custody matters than would ordinarily be the case for a nonbiological, nonadoptive parent:

> [A] psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial,

---

[25] The American Law Institute has framed the test as requiring that the putative parent "for a significant period of time not less than two years, (i) lived with the child and, (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions, (A) regularly performed a majority of the caretaking functions for the child, or (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived." Am. L. Inst., Principles of the Law of Family Dissolution § 2.03(1)(c) (2002).

not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian.

*In re Clifford K.*, 619 S.E.2d at 157.

¶ 75. I do not purport to recount the specific tests applied in each of the many decisions in recent decades in which courts have extended parental rights or responsibilities beyond biological parents. I review the above cases because I believe they reinforce and further develop our own case law that has identified the intent of both the legal and putative parents to foster a parent-child relationship between the putative parent and child, the conduct and contributions of both parents in caring for and raising a child, the way in which they hold the putative parent out to the broader world as a child's parent, and the presence or absence of other legally recognized parents[26] as factors — in addition to biological connection and a legal relationship with a child's legal parent — that are relevant to the question of whether a putative parent should be recognized as a legal parent. See *Miller-Jenkins*, 2006 VT 78, ¶ 56; *Godin*, 168 Vt. at 523, 725 A.2d at 910.[27]

---

[26] We need not address the question of whether the presence of two legal parents defeats a third putative parent's claim. See D. Wald, *The Parentage Puzzle: The Interplay Between Genetics, Procreative Intent, and Parental Conduct In Determining Legal Parentage*, 15 Am. U. J. Gender Soc. Pol'y & L. 379, 406-10 (2007) (arguing for legal recognition of more than two parents in certain limited circumstances). For the purposes of this case, and of our discussion of this factor in past cases, the absence of even a *second* parent is a legally significant factor in the parentage analysis.

[27] Although many of the cases cited herein involved same-sex parents, courts have applied the same analysis to parentage claims by putative fathers. See, e.g., *Middleton*, 633 S.E.2d at 167 (allowing claim for visitation by mother's ex-boyfriend who developed parent-child relationship with mother's encouragement, and with whom child lived half the time); *Atkinson v. Atkinson*, 408 N.W.2d 516, 520 (Mich. Ct. App. 1987) (nonbiological putative father entitled to seek custody where he and son had a close and affectionate father-son relationship cultivated with mother's participation, he was active in son's life and was the only father son had ever known, and he was prepared to take on the rights and responsibilities of supporting the child); see also *V.C. v. M.J.B.*, 748 A.2d at 552-53 (analogizing case involving acknowledged mother and putative mother to one involving acknowledged mother and putative father). Nothing about the logic of our own reliance on factors beyond biology and a legal relationship between the parent and putative parent is limited to claims by same-sex parents. The best interests of children in protection of established relationships with their parents do not turn on the genders of the parents.

## C.

¶ 76. I digress to address likely but unfounded concerns about the framework for ascertaining parentage established through this Court's existing case law prior to this case. First, it does not undermine the parental rights of fit, legal parents. That is a circular criticism; the threshold question here is *who* are legal parents. Recognition of the parental rights of a nonbiological parent's in an appropriate case is no more an unreasonable threat to the other parent than enforcement of a second biological parent's rights.

¶ 77. Moreover, the analysis this Court has undertaken in its precedents to date, as described above, does not invite unwarranted or constitutionally suspect judicial intrusion into the legally protected relationship between the child and the legal parent. As the New Jersey Supreme Court explained:

> This opinion should not be viewed as an incursion on the general right of a fit legal parent to raise his or her child without outside interference. What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation.

*V.C. v. M.J.B.*, 748 A.2d at 553-54; see also *Middleton*, 633 S.E.2d at 169 ("[W]hen a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing

him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced.").

¶ 78. The Washington Supreme Court has likewise expressly rejected the notion that its recognition of the parental rights of a person neither biologically related to a child, nor legally joined with the child's parent, represents a step down a slippery slope that could come to include nannies, teachers, adult siblings, or parents' exes:

> [A] threshold requirement . . . is a showing that the legal parent "consented to and fostered" the parent-child relationship. The State is not interfering on behalf of a third party in an insular family unit but is enforcing the rights and obligations of parenthood that attach to *de facto* parents; a status that can be achieved only through the active encouragement of the biological or adoptive parent by affirmatively establishing a family unit with the *de facto* parent and child or children that accompany the family.

*In re L.B.*, 122 P.3d 161, ¶ 47 (citation omitted); see also *Middleton*, 633 S.E.2d at 169 (recognizing that parenting conduct of putative parent "must be done for reasons other than financial gain, which guarantees that a paid babysitter or nanny cannot qualify" for parental rights).

¶ 79. Although this Court has not elaborated on the prerequisites to a showing that a recognized parent has consented to another's acting as a parent, it is clear from the contexts in which we have relied on a putative parent's established relationship with a child as a factor supporting parentage that the requisite level of engagement is indistinguishable from that of any other legally recognized parent, and that the participation of the recognized parent in promoting a parent-child relationship between the child and putative parent is essential. See, e.g., *Miller-Jenkins*, 2006 VT 78, ¶ 56 (noting that putative mother co-parented child from birth, and *both* parents held putative mother out as the child's other parent); *Godin*, 168 Vt. at 523, 725 A.2d at 910 (relying on fact that father raised child as his own, and he and child's mother held child out as father's). The requirements for and limitations on the ability of a nonbiological, nonlegally joined putative parent to establish parental rights reflected in the above decisions from other courts should and do apply with equal force here. To the

extent the majority suggests that this approach "would allow any former domestic partner to compel a biological parent to defend against the unrelated ex-partner's claim that he or she is a 'parent,' " *ante*, ¶ 21, the majority fails to recognize the high bar faced by a putative parent with no biological link to the child or legal link to the child's parent.

¶ 80. Finally, I reject the notion that in the name of judicial efficiency, or avoiding litigation, we should arrest and dial back our case-by-case approach to considering and identifying factors that determine parental status in favor of a very narrow bright line that requires either a biological connection or a legal relationship with a birth parent to support a claim of parenthood. Doing so cannot possibly be in the best interests of children because it denies a class of children with an established parent-child relationship with a nonbiological parent not legally joined with their acknowledged parent — formed with the participation of the children's acknowledged parent — legal protection for their relationship with that parent, depriving them of the financial, emotional and developmental support of that parent. See *In re B.L.V.B.*, 160 Vt. at 373, 628 A.2d at 1274 (construing adoption statute in a way that promotes the best interests of children).

¶ 81. Moreover, the notion of this kind of narrow, bright-line rule in the context of parentage and child custody disputes is incongruous. Per the Legislature's instructions, Vermont's courts already apply a multi-factorial, case-by-case analysis of the best interests of children to determine parental rights and responsibilities and parent-child contact in every divorce and parentage case in which these matters are contested. See 15 V.S.A. § 665. This is an area in which the law recognizes the wide variation in family circumstances, and the need for flexibility in fashioning an order that best suits the specific needs and best interests of each individual child. The Legislature could easily have chosen to reduce litigation and make custody determinations more efficient by establishing a conclusive presumption in favor of, for example, an established primary caregiver. It has not. *Harris v. Harris*, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988). Instead, the law requires that a court consider each of a host of designated factors in assigning parental rights and responsibilities. *Id.* Against this backdrop, the application of a narrow, bright-line rule that has the effect of preventing a parent from even getting to the best interests analysis in the very small class of cases at issue here is

incompatible with the general approach to protecting children reflected in our divorce and parentage statutes.

¶ 82. Nor is the majority's approach likely to channel human behavior in a desirable direction. Although adoption by the nonbiological parent would have been preferable in a case like this, most people do not generally study legal precedents in ordering their family relations. Their failure to do so should not operate to the detriment of minor children who had no say in the matter.

## III.

¶ 83. The final task is to apply the above considerations to the facts of this case. The standard of review makes a huge difference here. This Court is not reviewing the trial court's findings based on an evidentiary hearing. Nor is it reviewing a summary judgment ruling based on undisputed facts and disputed facts viewed in the light most favorable to the nonmoving party. The trial court dismissed putative father's claim here on the pleadings. "Dismissal under Rule 12(b)(6) is proper only when it is beyond doubt that there exist no facts or circumstances consistent with the complaint that would entitle the plaintiff to relief." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575, 959 A.2d 990 (mem.). The threshold a plaintiff must cross in order to meet the notice-pleading standard is "exceedingly low." *Id.* (quotation omitted). Moreover, in reviewing the trial court's grant of a motion to dismiss, this Court must take all facts alleged in the complaint as true. *Amiot v. Ames*, 166 Vt. 288, 291, 693 A.2d 675, 677 (1997).

¶ 84. In this case, putative father has alleged that both children call him "daddy or papa," that he was in the delivery room when M.S. was born and was one of the first people to hold her; he has been involved in L.M.'s life since she was six months old and M.S.'s since birth — participating in their respective first steps, first words, and other developmental milestones; even before moving in with the children's mother, he visited L.M. and M.S. almost every day during the first six months of M.S.'s life; he lived with mother and the children from the time M.S. was about six months old, in August 2006, through March 2009; he changed diapers, tended to them when they cried in the middle of the night, and did all the things a good father does when needed by his or her child; he was involved with M.S.'s preschool programming; he went to all school and ballet performances in which

either child was involved; he provided all the basic necessities for the children such as food, shelter and clothing, and also paid for ballet lessons and school supplies; *after* mother and the children moved out in March 2009 until April 2011, he spent about 600 days of the next 730 days with the children; in April 2011, their mother voluntarily left them to live with him at least six days a week for nearly a year until March 2012; mother frequently cancelled or no-showed for her regular scheduled visits with the children during that time period; and mother abruptly removed the children from the schools they were attending while living with putative father with only three months remaining in the term.

¶ 85. Father has provided far more than bare notice of his claims; he has made extensive allegations that could potentially support a finding of parentage. We cannot judge this case as if his allegations were undisputed facts subject to summary judgment review; father has not had a chance to develop his case. Although he unquestionably faces substantial hurdles — the showing he must make in the absence of a biological link to the children or of a legal relationship to their mother is a challenging one — I cannot conclude that given the above allegations it is beyond doubt that father cannot muster sufficient evidence to make that showing. I would reverse and remand for further proceedings.

¶ 86. When confronted with a question unanswered by the Legislature, our task is to do our best to discern the Legislature's intent and rule accordingly. I believe the majority got it wrong. Thankfully, we are not the last word in such matters, and the Legislature has the power to pass laws to ensure that other children in L.M. and M.S.'s circumstances are not denied the continuing financial, emotional, and developmental support of one of their actual parents because their biological parent has "pulled rank" and denied the other's parental status after promoting and cultivating that parent's relationship with the child for most or all of the children's lives — in this case six years. If the majority's analysis were to stand, the consequences for some children, potentially including L.M. and M.S., would be nothing short of tragic.