NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 8

No. 2014-270

| | |
|---|---|
| Debra L. McGee / Office of Child Support | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Family Division |
| Justin Gonyo | April Term, 2015 |

Linda Levitt, J.

Debra L. McGee, Pro Se, Georgia, Plaintiff-Appellee.

Mary Billings Munger, Burlington, for Plaintiff-Appellee Office of Child Support.

Justin Gonyo, Pro Se, Fairfax, Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **EATON, J.** Defendant Justin Gonyo appeals pro se from a family court order of nonparentage. Defendant contends the court erred in concluding that he lacked the statutory authority to file a voluntary acknowledgment of parentage and parentage action because he is not the child's biological parent. We affirm, albeit on a different basis from the trial court.

¶ 2. The facts may be summarized as follows. The child, a girl, was born on May 27, 2011. Shortly thereafter, on June 6, 2011, the child's mother and defendant filed a Voluntary Acknowledgment of Parentage (VAP) form with the Department of Health, Agency of Human Services. Both parties signed the form, which stated that they "voluntarily and without coercion, and of our own free will, hereby acknowledge that we are the biological parents of the child" and understand and accept "the legal rights and responsibilities that come with being a parent,"

including rights to custody, visitation, and notice before the child may be adopted. The child's birth certificate identified mother and defendant as the child's parents.

¶ 3.   Mother and defendant separated in 2012.[1]  About a year later, in October 2013, the Office of Child Support (OCS) filed a Complaint for Support and Recovery of Debt, together with a "Motion for Genetic Testing Despite Parentage Presumption."  The motion alleged that, despite the presumption of parentage arising from the VAP, there were grounds to believe that defendant was not the biological father based on mother's affidavit naming another individual as the biological father, and stating that she was already fourteen weeks pregnant when she and defendant got together.  The following month, defendant filed a pro se pleading in which he opposed the motion for genetic testing and asked the court "to grant [him] a parentage order of the child."  Defendant acknowledged that he was not the child's biological father and was aware of this when he signed the VAP, but claimed that there was "nothing wrong" with doing so, and that the time for rescinding it had expired.  Defendant followed with a more formal motion to establish parentage in December 2013.

¶ 4.   In the meantime, the family court granted the motion for genetic testing, which took place in early January 2014.  The test excluded defendant as the child's biological father.

---

[1]  Defendant later testified that he moved out of the home he shared with mother and the child in November 2012; mother indicated that it was in June or July 2012. The factual disparity is not legally material.  The dissenting opinion nevertheless "accept[s] for purposes of . . . analysis" all of defendant's representations about his relationship with mother and the child, and based thereon finds the result here to be "distressing."  Post, ¶ 25 n.9.  The dissent does not explain the basis for accepting defendant's characterization of the family dynamics over that of mother, who painted a different, and somewhat more troubling picture of a relationship that lasted about one year.  Mother indicated that defendant moved out in June or July—when the child would have been twelve to fourteen months old, and thereafter engaged in such threatening behavior that she was compelled to obtain a restraining order.  Whatever the "equities" in this or any other case, the dissent's concern that our holding vacating the fraudulent VAP may allow a disaffected biological mother to disturb a child's settled relationship with the putative biological father, contrary to the child's best interests, may be addressed through the settled expedient of adoption.  See Titchenal v. Dexter, 166 Vt. 373, 380, 693 A.2d 682, 686 (1997) (noting that nonbiological putative parents may obtain parental rights and responsibilities "through adoption"); see also Moreau v. Sylvester, 2014 VT 31, ¶ 35, 196 Vt. 183, 95 A.3d 416 (reaffirming Titchenal).

Later that month, mother filed a pro se motion to dismiss defendant's parentage action, and OCS moved to set aside the VAP and to set the matter for a hearing. In February 2014, the family court issued a summary "order of non-parentage" based on the genetic test, dismissed defendant's parentage action, and ordered the case closed. Defendant, in response, moved for reconsideration, and OCS moved to reopen the matter and set it for a hearing to address "the nature of the VAP and the power of the Court to set it aside." The court scheduled the matter for a hearing in May 2014.

¶ 5. Defendant appeared pro se at the hearing and testified in his own behalf. Defendant testified that he began living with mother when she was already fourteen weeks pregnant, was present at the child's birth, took an active role in the care of the child, and bought her clothes and gifts. Defendant stated that he moved out of the home in November 2012, when the child was about seventeen months old, but continued to visit with her until mother was granted a relief-from-abuse order in May 2014, barring him from contacting either mother or the child.[2]

¶ 6. Mother also testified, acknowledging that she and defendant had knowingly signed the VAP, which falsely stated that defendant was the child's biological father. She admitted that defendant had been "good" with the child, but stated that he had recently been harassing and stalking her. Her reason for seeking to rescind the VAP, mother explained, was to afford the biological father an opportunity to become more involved with the child, an opportunity he had not thus far pursued.

¶ 7. The parties submitted additional briefing following the hearing. Among other arguments, OCS maintained that the presumption of parentage arising from the VAP was in the nature of a judicial order; that the VAP was limited to biological parents; that both parties here knowingly misrepresented defendant's status as the child's biological father; and therefore that

---

[2] As noted, mother disputed father's testimony that he moved out in November 2012, claiming that it was earlier in the year.

the VAP could be set aside under Vermont Rule of Civil Procedure 60(b) as a "fraud upon the court."

¶ 8. The family court issued a written decision in July 2014, reaffirming its earlier ruling. The court concluded that defendant lacked standing to bring a parentage action because he is not the "natural parent" of the child under 15 V.S.A. § 302(a) (limiting actions to establish parentage to a few categories, including "a person alleged or alleging himself to be the natural parent of a child"), and further concluded that the VAP was ineffective to establish parentage because defendant is not a "biological" parent of the child. See id. § 307(d) ("A witnessed Voluntary Acknowledgment of Parentage form signed by both biological parents under this section shall be a presumptive legal determination of parentage upon filing with the department of health provided no court has previously adjudicated parentage or no legal presumption of legitimacy otherwise applies."). This pro se appeal by defendant followed.

¶ 9. We begin with the validity of the VAP, which we find to be dispositive. As explained below, we agree with OCS's assertion that, inasmuch as both signatories knowingly misrepresented defendant to be the child's biological father, the VAP in this case was a per se fraud upon the court, and properly set aside on that basis.

¶ 10. As noted, a presumption of parentage may be established under the Parentage Proceedings Act, 15 V.S.A. §§ 301-308, by the filing of "[a] witnessed Voluntary Acknowledgment of Paternity form signed by both biological parents under this section." Id. § 307(d). Consistent with the statute, the VAP signed by mother and defendant here expressly stated that, by signing "we acknowledge that we are the biological parents of this child."

¶ 11. The Act places considerable emphasis on the legal consequences of filing a signed VAP, providing that it establishes "a presumptive legal determination of parentage," id. (emphasis added), which may be subsequently rescinded only "within 60 days after signing the form" and thereafter "challenged only pursuant to Rule 60 of the Vermont Rules of Civil

4

Procedure." Id. § 307(f). The Act also requires that VAP forms contain express language "emphasizing the gravity of the effects of acknowledging parentage and the rights and responsibilities which attach." Id. § 307(b). Thus, the VAP signed by defendant and mother here explained that, while the law assumes an unmarried mother is the biological parent, it "[d]oes not recognize the father until parentage has been legally established"; cautioned neither parent to sign the VAP if he or she had any doubt "about the father's identity"; and confirmed that, by signing, "both parents accept the legal rights and responsibilities that come with being a parent."

¶ 12.    It is not surprising, therefore, that courts have generally concluded that voluntary acknowledgments of paternity effectively "operate as judgments," In re Parentage of G.E.M., 890 N.E.2d 944, 953 (Ill. App. Ct. 2008), a conclusion reinforced by the common statutory provision authorizing later challenges to VAPs solely by means of a motion for relief from judgment. See 15 V.S.A. § 307(f) (providing that, if not rescinded within sixty days, a VAP "may be challenged only pursuant to Rule 60 of the Vermont Rules of Civil Procedure" motion for relief from judgment or order); Cesar C. v. Alicia L., 800 N.W.2d 249, 255 (Neb. 2011) (holding that "establishment of paternity by acknowledgment is the equivalent of establishment of paternity by a judicial proceeding"); In re Gendron, 950 A.2d 151, 154 (N.H. 2008) (concluding that, "by signing the acknowledgment, the mother, by her own volition, accepted that the father is the child's biological father," and that "[a]ccordingly . . . the acknowledgment now has the same force and effect as a Massachusetts court judgment").

¶ 13.    As more fully discussed below, in recognition of the significant legal consequences of an acknowledgement of paternity, a number of courts have held that where—as here—parties fraudulently collude to establish parentage, the legal determination of paternity may be set aside as a "fraud on the court." Although in Vermont, as elsewhere, a motion for relief from judgment based on fraud or misrepresentation must be filed within one year of the

5

proceeding, a motion brought under the general provision for "any other reason justifying relief" must "be filed within a reasonable time," and therefore may be brought outside the one-year limitation period. V.R.C.P. 60(b)(6). Thus, in Godin v. Godin, we recognized that a claim of fraud "upon the court" is "governed by the catch-all provision of Rule 60(b)(6)" and therefore is not subject to the one-year limitation period. 168 Vt. 514, 518-19, 725 A.2d 904, 907 (1998) (observing that the question was "whether the fraud alleged . . . may properly be characterized as a fraud upon the court and therefore exempt from the one-year statute of limitations); see also Olio v. Olio, 2012 VT 44, ¶ 17, 192 Vt. 41, 54 A.3d 510 (reaffirming that Godin "recognized a narrow exception to the . . . [one-year] . . . rule for certain motions for relief from judgment alleging egregious fraud on the court" under Rule 60(b)(6)). "Fraud on the court" as a basis for relief under the catch-all provision of Rule 60(b)(6) is widely recognized. See, e.g., Carter v. Anderson, 585 F.3d 1007, 1012 (6th Cir. 2009) ("A Rule 60(b)(6) motion is an appropriate vehicle to bring forward a claim for fraud on the court."); Latshaw v. Trainer Wortham & Co., 452 F.3d 1097, 1104 (9th Cir. 2006) ("Acts of 'fraud on the court' can sometimes constitute extraordinary circumstances meriting relief under Rule 60(b)(6)."); Trim v. Trim, 2007-CT-01648-SCT (¶ 7), 33 So. 3d 471 (Miss. 2010) ("Rule 60(b)(6) provides a 'catch-all' provision under which relief may be granted in exceptional and compelling circumstances, such as for fraud upon the court."). As we noted in Godin, Rule 60(b) also preserves an independent action "to set aside a judgment for fraud upon the court," although Godin was not decided on that basis. 168 Vt. at 518, 725 A.2d at 907.

¶ 14. Applying this rubric, a number of courts have set aside fraudulently obtained parentage determinations in circumstances similar to those presented here. In re Tompkins, for example, concerned a mother and a man named Brown who together "fabricated and filed a joint petition to establish paternity" despite the fact that both "knew that Brown was not the biological father." 518 N.E.2d 500, 506 (Ind. Ct. App. 1988). While acknowledging that the fraud-on-the-

6

court doctrine had traditionally been "narrowly applied" to "egregious circumstances" involving efforts to "improperly influence the court's decision" or prevent a party from "presenting his case," the Tompkins court concluded that the facts "and their underling implications" supported such a finding. Id. at 507. The scheme perpetrated by the parties, the court explained, had "suppress[ed [the child's] true paternity" and precluded an adoption proceeding where counsel for the child might have "assert[ed] his interests." Id. at 506-07; see also Seger v. Seger, 780 N.E.2d 855, 858 (Ind. Ct. App. 2002) (affirming judgment setting aside "paternity affidavit" where both parties knew that man was not child's biological father, and explaining that parentage proceeding "is not tantamount to . . . adoption," and there was no showing of notice to, or consent by, child's biological father as required in such proceeding). See generally J. Parness, For Those Not John Edwards: More and Better Paternity Acknowledgments at Birth, 40 U. Balt. L. Rev. 53, 99 (2010) ("Acknowledgments for nonmarital children by nongenetic fathers allow circumvention of adoption laws, which seek to assure that when legal parentage is accorded to men and women with no preexisting parental interests, the children's best interests are served").

¶ 15.   In Jones v. Weller, 362 N.E.2d 73 (Ill. App. Ct. 1977), as here, both parties also executed affidavits in support of an acknowledgment of paternity falsely stating that Weller was the child's biological father, and later divorced pursuant to a decree granting him parental rights. Weller later opposed efforts by mother's new husband to adopt the child, but the court concluded that he lacked standing as a parent on the ground that "[b]oth parties [had] . . . committed fraud upon the court" in misrepresenting Weller's status as the child's biological father. Id. at 76. As the court explained, it was contrary to public policy "to perpetuate a fraud which was instigated by [Weller] and consented to by [the mother]," noting that divorce proceedings were not "intended to supplant the Adoption Act . . . to provide an optional procedure for the establishment of parentage." Id.; see also In re Olenick, 562 N.E.2d 293, 299 (Ill. App. Ct. 1990) (holding that affidavit of parentage signed by mother and decedent falsely stating that both were

"natural parents" of child was equivalent to assertion of "biological" or "blood" relationship, and was invalid as "a fraud on the court").

¶ 16. The facts here present a close fit to these cases, and compel a similar conclusion. Both parties acknowledge that they knowingly filed the VAP falsely identifying defendant as the child's biological father, and mother conceded that until recently the child's biological father "didn't even know she existed." As OCS correctly observes, the effect of the parties' fraudulent conduct was thus to "employ the VAP as a de facto adoption process, side-stepping the requirements of [the Adoption Act], compliance with which would require notice to all interested persons and the filing of consents to adoption, absent which a hearing would be held" in which the court considered all of the relevant interests.[3] This is a classic fraud on the court, depriving the interested parties—including the child, the biological father, and the State as parens patriae— their day in court. [4]

¶ 17. Of course, like most courts elsewhere, we have also recognized that "the fraud-on-the-court doctrine must be narrowly applied" lest it "become indistinguishable from ordinary fraud, and undermine the important policy favoring finality of judgments." Godin, 168 Vt. at 518, 725 A.2d at 907. Indeed, Godin itself involved an alleged misrepresentation of paternity—a post-divorce claim by the putative father that the mother had failed to inform him that he was not the biological father—but we concluded that "to the extent the mother's conduct was fraudulent, if at all, it constituted fraud upon plaintiff, not upon the court." Id. (emphases added). As we explained, there was "nothing fraudulent" in the mother's representation that the child was "born of the marriage" inasmuch as the law "supplied the presumption that plaintiff was the child's

---

[3] Indeed, as noted, supra, ¶ 3 n.1, the dissent's concern about allowing the subsequent disavowal of a falsely executed VAP would be obviated had the putative father here adopted the child.

[4] Although there may be shortcomings in the Parentage Proceedings Act, it is clear that it is not intended to provide a shortcut to the adoption process. There is no apparent reason why defendant could not have filed an adoption proceeding seeking to adopt the child.

natural parent," and "the mere nondisclosure to an adverse party" or the court of facts pertinent to a controversy do not "add up to 'fraud on the court' for purposes of vacating a judgment under Rule 60(b).' " Id. at 519-20, 725 A.2d at 908.

¶ 18.    This case, as the decisions cited above recognize, is different.  Here, the fraud was not perpetrated by one party against another, but by both parties agreeing together to perpetrate a fraud on the court, and the judicial process, by falsely representing defendant to be the child's biological parent. This was not a case where a VAP was signed by the parties under a mistaken belief that they were the child's biological parents, or where one party was intentionally misled by the other.  See, e.g., In re B.N.C., 822 N.E.2d 616, 620 (Ind. Ct. App. 2005) (denying putative biological father's motion to set aside parentage affidavit and judgment based on alleged fraud on the court where facts "failed to establish that [the signers] engaged in a deliberately planned and carefully executed scheme to improperly influence the trial court to issue the paternity judgment" (quotation omitted)).  On the contrary, these parties knew at the time they signed the VAP that defendant was not what he was purporting himself to be.  Nor is this a case where the record shows that a putative parent has neglected to challenge a parentage acknowledgment for such an unreasonable length of time that it would be unconscionable to set it aside.  See id. at 619 n.6 (while not deciding case on basis of laches, court noted that putative biological father had voluntarily abandoned motion for relief from judgment in 1995 and had waited more than a decade to renew it).  Defendant admittedly left the home in 2012, when the child was no more than sixteen or seventeen months old, and the VAP was challenged the following year.  Thus, there are no facts here to support a finding of unreasonable delay.

¶ 19. We conclude, accordingly, that the undisputed facts support the motion to set aside the acknowledgment of paternity as a fraud on the court, and affirm the judgment of nonparentage as to defendant on that basis.[5]

¶ 20. We also affirm the trial court's dismissal of defendant's action to establish parentage. Because the "presumptive legal determination of parentage" under 15 V.S.A. § 307(d) remained in effect at the time he filed suit, defendant lacked standing to bring the action. See id. § 302(a) (providing that action to establish parentage may be brought only "where parentage has not been previously determined either by an action under this subchapter or by adoption"). We must presume the Legislature chose its words deliberately. Robes v. Town of Hartford, 161 Vt. 187, 193, 636 A.2d 342, 347 (1993) ("[W]e presume that the legislature chose its words advisedly."). Therefore, in allowing "an action to establish parentage" only where parentage has not been previously determined by "an action under this subchapter," 15 V.S.A. § 302(a), we must conclude that the Legislature intended the underscored language to mean something different from, and broader than, simply an adjudication pursuant to an "action to establish parentage." As discussed, the Act provides for the establishment of parentage not only by the filing a "complaint brought under this subchapter," id. § 303(b), but also by the filing of a voluntary acknowledgment of parentage. Id. § 307(d). Moreover, as discussed, an acknowledgment of paternity assumes the dignity and status of "a presumptive legal determination of parentage upon filing . . . provided no court has previously adjudicated parentage," and may be challenged only pursuant to a motion for relief from judgment under Rule 60. Id. § 307(d), (e). It is logical, therefore, to conclude that a determination of parentage pursuant to "an action under this subchapter" includes the parentage presumption arising from a

---

[5] The motion to set aside the VAP was filed by OCS on behalf of mother, a signatory to the VAP; therefore, we discern no issue here relating to standing. Cf. Columbia v. Lawton, 2013 VT 2, ¶ 30, 193 Vt. 165, 71 A.3d 1218 (acknowledging some uncertainty as to nonparty's standing to challenge parentage judgment under Rule 60(b)).

VAP, and therefore that defendant lacked standing to bring his parentage complaint under § 302.[6]

Affirmed.

FOR THE COURT:

_____<br>Associate Justice

¶ 21. **DOOLEY, J., concurring.** I agree that the action of the parties was a fraud on the court, see Godin v. Godin, 168 Vt. 514, 527-529, 725 A.2d 904, 912-14 (1998) (Dooley, J., dissenting), but if this were an ordinary statutory construction case, I might be persuaded as Justice Robinson has written in her dissent that 15 V.S.A. § 307 controls the issue of setting aside a voluntary acknowledgement of parentage. As I have emphasized before, this is not an ordinary statute. See Moreau v. Sylvester, 2014 VT 31, ¶ 41, 196 Vt. 183, 95 A.3d 416 (Dooley, J., concurring). Although it ostensibly covers rights and responsibilities with respect to children other than those connected with child support, it was passed by an act entitled "An Act Relating to Child Support," 1989, No. 220 (Adj. Sess.), § 30, and virtually all the aspects of that act relate

---

[6] Defendant was barred from bringing the independent parentage action because the VAP was in effect at the time he filed the action. The fact that we have subsequently set aside the VAP by our holding today does not undermine this conclusion, contrary to the dissent's claim. As the dissent also recognizes, any new parentage action filed by defendant in the future would need to confront the interpretation in Moreau equating the term "natural parent" in the parentage statute with "biological" parent, 2014 VT 31, ¶ 20 n.9, although we need not address that issue here.

We also note that this conclusion is buttressed by federal law requiring, as a condition for receiving federal welfare funding, that states establish simple and expedited paternity establishment procedures, both judicial and nonjudicial, including standards for voluntary acknowledgments of paternity to serve as a "[l]egal finding of paternity." 42 U.S.C. § 666(a)(5)(D)(ii). See generally V. Cacioppo, Note, Voluntary Acknowledgments of Paternity: Should Biology Play a Role in Determining Who Can Be a Legal Father, 38 Ind. L. Rev.. 479, 486 (2005) (summarizing federal rules and observing that, "in creating a non-judicial means for fathers to obtain legal paternity, Congress devised a way to save time and money by eliminating the need to go before a court to receive a final paternity judgment").

11

only to child support. The section was added to our Parentage Act, which I have noted before, was intended "to do [nothing]. . . other than provide a speedy recovery of child support." Miller-Jenkins v. Miller-Jenkins, 2006 VT 78, ¶ 44, 180 Vt. 441, 912 A.2d 951. Despite its language, its application to determine rights of custody and visitation is virtually an unintended consequence. For that reason, in my view, it lacks adequate protections to safeguard the best interest of the child and ensure that the acknowledgement is not misused. For that reason, I favor construing the statute quite narrowly and relying on powers outside the statute, if available, to ensure an acceptable result.

¶ 22. Now comes the broken record. The continuing failure to enact a real parentage act is the largest and most significant deficiency in our statutory scheme regulating the rights and responsibilities of family members where the interests of children are involved. I explained some of the consequences of this failure in my concurring opinion in Moreau. I also explained that there are models from which we can draw our own modern and complete parentage act, particularly the Uniform Parentage Act. This case is another example of the consequences of that failure. I again urge the Legislature to meet this critical need.

_____
Associate Justice

¶ 23. **ROBINSON, J., dissenting.** In its elevation of biological connection between parent and child over our ordinary rules regarding the finality of judgments, the majority has adopted a legal rule that is at odds with our prior case law, and is squarely contrary to the best interests of Vermont's children.

¶ 24. Before addressing the majority's legal reasoning, I note two considerations relating to the framing of this case. First, it's unfortunate, but not surprising, that this case arises in the context of allegations by Ms. McGee (mother) against Mr. Gonyo (putative father) that

paint putative father in an unfavorable light. It's not surprising, because a biological[7] mother, who has previously signed a voluntary acknowledgment of the parenthood of an individual about whom she has nothing bad to say, is far less likely to seek to cut off that individual's parental relationship with their child than one who has become disaffected with the other acknowledged parent.[8] It's unfortunate because I fear that the specific factual circumstances of this case might cloud the legal analysis.

¶ 25. The majority has apparently established a per se rule that two parents who sign a voluntary acknowledgment of parentage (VAP), knowing that one of them is not biologically related to the child, have committed a fraud upon the court such that the acknowledgment may be set aside by the court at any time; this rule will apply with equal force in a range of factual settings in which its application may seem far more inequitable to all concerned.[9] If putative

---

[7] I use the term "biological" to describe mother's relationship to the child because that is the term that this Court, and many other courts, have commonly used. I acknowledge that the term is imprecise: it does not clearly signal whether the significant characteristic of the parent-child connection is that the parent bore the child or, rather, is that the child carries the parent's DNA. See Moreau v. Sylvester, 2014 VT 31, ¶ 46 n.19, 196 Vt. 183, 95 A.3d 416 (Robinson, J., dissenting) (recognizing that "biological" connection can encompass two related but distinct relationships genetic and gestational). In cases in which a child is conceived by in vitro fertilization using an egg from someone other than the gestational parent, the gestational parent may not be a genetic parent. This case does not require us to drill down further; mother is both a gestational parent and a genetic parent; putative father is neither.

[8] See Moreau, 2014 VT 31, ¶ 46, n.18 (Robinson, J., dissenting) (noting that abuse allegations by mother against putative father are immaterial to parentage analysis, and that even if court legally recognized father as children's parent, it could deny him parental rights and responsibilities and even parent-child contact if facts warranted such ruling).

[9] I don't mean to suggest that the consequences of the majority's analysis are not inequitable in this case. Given that the trial court resolved this case on the basis that putative father is not the child's biological father, I accept for purposes of this analysis father's testimony that: (1) mother and putative father held him out to each other, their child, and the world as the child's father; (2) putative father lived with mother and helped raise the child for nearly the first year and a half of the child's life; (3) after putative father and mother separated he maintained frequent contact with the child for the next year; (4) putative father is the only father child has ever known; (5) putative father has provided parental love and care for the child and stands ready to continue doing so; and (6) putative father has provided material support for the child and is prepared to financially support her as a parent. Given these assumptions, the loss to both

13

father were a model parent, and had served for years as the child's primary caregiver and sole means of support, mother could nonetheless unilaterally take action to sever his parent-child relationship to accommodate a new partner in her life. Likewise, if putative father had held himself out to the world as the child's parent for years, but then sought to sever his legal obligations because he won the lottery and wanted to avoid paying increased child support, or he wanted to get out from under a child-support arrearage, he could do so. The majority's broad exception to our ordinary rules of finality leaves both parties to a VAP with the open-ended power to avoid the consequences of that commitment, and the accompanying legal judgment, when it serves their own self-interest, without regard to the best interests of the child for whom they had agreed to share responsibility.

¶ 26.    Second, the status of the supposed biological father in this case is relevant. This is <u>not</u> a case in which the court is confronted with a claim by the supposed biological father seeking recognition of his parental status in lieu of or in addition to an already legally recognized parent. Instead, this is a case in which <u>mother</u>—who previously signed and filed with the Department of Health a VAP acknowledging putative father as the child's father—has decided that she now wants to disavow that prior acknowledgment. The distinction is significant. As set forth more fully below, if the supposed biological father sought to establish his parental rights, he would be entitled to do so to the extent that his claims of parentage enjoyed constitutional protection. <u>Columbia v. Lawton</u>, 2013 VT 2, ¶ 30, 193 Vt. 165, 71 A.3d 1218. But he has not. And mother does not have standing to assert the claims of the supposed biological father.

¶ 27.    All we know about the supposed biological father is that: (1) mother alleges him to be the child's biological father; and (2) he has made no effort to pursue parental rights for this child even though several months before the hearing in this case mother sent him a letter, a text,

---

putative father and child of legal protection for their established bond and the loss to child of the added security of having two parents responsible for her care and support is distressing.

and an email informing him that she believed him to be the child's biological father.  Mother had this to say about the supposed biological father:

> [H]e is a good guy, what I knew of him.  We were only dating maybe four months before I got pregnant.  We did get in one fight, and the cops were called, and, you know, I haven't seen him since.  You know, I never really pushed the matter, so he never—he doesn't—not till now didn't even know she existed.

At this stage, we cannot assume that a ruling denying putative father's parental status will clear the way for a ruling assigning parentage of this child to someone else.  The person mother now apparently names as the child's biological father has not pursued his potential parental rights, and we do not know whether he is, in fact, the child's biological father.  We do not even know whether the child has another living biological parent at all, let alone a parent with any inclination to assume a parental role of any sort.  All we know with confidence is that the trial court's ruling leaves this child, at least for now, and possibly indefinitely, with only one legally recognized parent—an outcome we should generally disfavor.

## I.

¶ 28.  With these considerations in mind, I turn to the critical flaws in the majority's reasoning.  This is not simply another nonbiological parenting case.  See, e.g., Moreau, 2014 VT 31.  This case involves the finality of a final judgment of parentage in the face of a claim by one of the parties to the original proceeding, more than two years later, that an adjudicated parent shares no biological connection with the child.  In considering this issue—a close cousin to a question this Court has faced before—the majority has dialed back this Court's established commitment to finality in a context in which that finality is most, not least, urgent.

¶ 29.  I agree with the majority that a voluntary acknowledgment of parentage that is not rescinded within sixty days operates as a judgment that may be challenged only pursuant to Rule 60 of the Vermont Rules of Civil Procedure.  15 V.S.A. § 307(f).  In that sense, it has the same

effect as a judicial determination of parentage in a parentage action, or a judgment of parentage intrinsic to a final divorce judgment.  The Legislature has been clear about that.

¶ 30.  We have emphasized that challenges to a final judgment on the basis of fraud must be brought within one year of the judgment.  See V.R.F.P. 4(a)(1) (making Rules of Civil Procedure applicable to parentage actions unless otherwise provided); V.R.C.P. 60(b)(3) (providing that motion to set aside judgment on the basis of fraud must be brought within a year). And we have held that relief under Rule 60(b)(6) is available only when the ground justifying relief is not encompassed within any of the first five classes of the rule.  See Olio v. Olio, 2012 VT 44, ¶ 14, 192 Vt. 41, 54 A.3d 510.  "Otherwise, Rule 60(b)(6) would serve as a 'backdoor' to circumvent the one-year time limit in subsections (b)(1)-(3)."  Id. (quotation omitted). Accordingly, once a year has passed since a final judgment, a party cannot seek to set aside that judgment on the ground that it was procured through fraud.  Id. ¶¶ 15-16.  We have recognized that this doctrine may lead to "unfair results in cases where a successfully concealed fraud cannot be remedied under Rule 60(b)(3) after the judgment is in place for more than one year," but have concluded that apart from certain egregious cases, the "balance between the competing imperatives of finality of judgments, on the one hand, and justice in every case on the other . . . our solicitude for finality must trump."  Id. ¶ 22.

¶ 31.  In this case, the majority invokes a narrow exception to this principal for instances of "fraud on the court."  We first recognized, but declined to apply this narrow exception in the case of Godin v. Godin, 168 Vt. 514, 518-20, 725 A.2d 904, 907-08 (1998).  In Godin, we commented that the U.S. Supreme Court's decision in the case of Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), allowed a motion to set aside a judgment pursuant to Rule 60(b)(6) where "an attorney for the Hartford-Empire Glass Company fabricated an article, claimed it was authored by a former president of the Glass Workers' Union, and later used the falsified article in a patent case before an appellate court to receive a favorable judgment."  168

16

Vt. at 518. Characterizing the fraud as "a wrong against the institutions set up to protect and safeguard the public," Hazel-Atlas, 322 U.S. at 246, and distinguishing the fraud underlying the judgment in question from that underlying a judgment secured through perjured testimony, the Court concluded that the "tampering with the administration of justice" by counsel for Hartford-Empire justified the court's exercise of equitable power to set aside the "fraudulently begotten judgment." Id. at 245-46.

¶ 32. This Court offered the following analysis of the evolution of the "fraud on the court" doctrine following the Hazel-Atlas decision:

> Since Hazel-Atlas, courts and commentators alike have observed that the fraud-on-the-court doctrine must be narrowly applied, or it would become indistinguishable from ordinary fraud, and undermine the important policy favoring finality of judgments. "If fraud on the court were to be given a broad interpretation that encompassed virtually all forms of fraudulent misconduct between the parties, judgments would never be final and the time limitations of Rule 60(b) would be meaningless." 12 J. Moore, et al., Moore's Federal Practice ¶ 60.21[4][c], at 60-55 (3d ed. 1997). Thus, the doctrine has generally been reserved for only the most egregious misconduct evidencing, as in Hazel-Atlas, an unconscionable and calculated design to improperly influence the court. See, e.g., Wilson v. Johns-Manville Sales Corp., 873 F.2d 869, 872 (5th Cir. 1989) (fraud on the court requires showing of unconscionable plan or scheme designed to improperly influence court in its decision). As one federal court has explained, the narrow fraud-on-the-court concept should "embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." As another court has observed: "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as . . . fabrication of evidence by counsel, and must be supported by clear, unequivocal, and convincing evidence."

Godin, 168 Vt. 518-519, 725 A.2d 904, 907-08 (citation omitted).

¶ 33. In Godin, we considered a motion to require genetic testing to determine the paternity of a child six years after the final divorce decree that deemed the child to be a child of the marriage. The husband invoked the fraud-on-the-court doctrine in seeking to set aside the

17

paternity judgment implicit in the final divorce order, arguing that wife had committed fraud on the court, in addition to fraud against him, by representing in her divorce pleadings that he was the father of the child in question. Because "the mere nondisclosure to an adverse party and to the court of facts pertinent to a controversy before the court does not add up to 'fraud upon the court,' for purposes of vacating a judgment under Rule 60(b)," Godin, 168 Vt. at 520, 720 A.2d at 98 (quotation omitted), this Court rejected the husband's fraud-on-the-court argument and declined to allow the Rule 60(b)(6) motion.[10]

¶ 34.    In analyzing the husband's claim that the facts of the case presented "special circumstances" warranting the exercise of the court's equitable jurisdiction despite the passage of time and application of res judicata, this Court considered the policy implications of allowing belated challenges to parentage determinations predicated on the absence of a biological connection.    Id.    This Court explained, "[e]ven more compelling, in our view, are the fundamental policy concerns that require finality of paternity adjudications."    Id. at 521, 725 A.2d at 909.  I quote the Court's discussion of these policy concerns at length because they are directly relevant to this case:

> [T]he State retains a strong and direct interest in ensuring that children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern over a child's biological origins. These themes underlie the conclusion, reached by numerous courts, that the public interest in finality of paternity determinations is compelling, and that the doctrine of res judicata therefore bars subsequent attempts to disprove paternity. See, e.g., Hackley v. Hackley, 395 N.W.2d 906, 913-14 (Mich. 1986) (best interests of child in maintaining stability and preventing psychological trauma must prevail over any unfairness to father resulting from denial of challenge to paternity nine years after judgment of divorce); Richard B., 625 N.Y.S.2d at 130 ("unequivocal trend . . . has been to zealously safeguard the welfare, stability and best interests of

---

[10]    The majority asserts that "in Godin v. Godin we recognized that the plaintiff's claim of fraud 'upon the court' is 'governed by the catch-all provision of Rule 60(b)(6)' and therefore is not subject to the one-year limitation period." Ante, ¶ 13. That characterization of Godin is flatly wrong. The court recognized the fraud-on-the-court doctrine, but then declined to apply it in that case.

the child by rejecting untimely challenges affecting his or her legitimacy") (quoting Ettore I., 513 N.Y.S.2d at 738); JRW & KB v. DJB, 814 P.2d 1256, 1265 (Wyo. 1991) ("Because of the potentially damaging effect that relitigation of a paternity determination might have on innocent children, the doctrine of res judicata and collateral estoppel are rigorously observed in the paternity context.")

. . . .

Although we understand the plaintiff's interest in ascertaining the true genetic makeup of the child, we agree with the many jurisdictions holding that the financial and emotional welfare of the child, and the preservation of an established parent-child relationship, must remain paramount. Where the presumptive father has held himself out as the child's parent, and engaged in an ongoing parent-child relationship for a period of years, he may not disavow that relationship and destroy a child's long-held assumptions, solely for his own self-interest. See Ettore I, 513 N.Y.S.2d at 740 (holding father's "self-serving" effort to disavow paternity to be inconsistent with policy of protecting innocent children from irreparable loss of financial security and paternal bonds. Whatever the interests of the presumed father in ascertaining the genetic "truth" of a child's origins, they remain subsidiary to the interests of the state, the family, and the child in maintaining the continuity, financial support, and psychological security of an established parent-child relationship. Therefore, absent a clear and convincing showing that it would serve the best interests of the child, a prior adjudication of paternity is conclusive.

Godin, 168 Vt. at 522-24, 725 A.2d at 910.

¶ 35. The majority's opinion flies in the face of Godin in a couple of ways. In Godin we held that the wife's misrepresentation (by omission) that the husband was not the child's biological father did not amount to a fraud on the court. This holding is difficult to square with the majority's conclusion here that mother and putative father's misrepresentation on a VAP form filed with the Department of Health is so unconscionable and so undermines the legal system as to render it a fraud on the court. The majority tries to distinguish the situation here by emphasizing that in this case both parties made misrepresentations on the VAP form, instead of one party deceiving the other, as in Godin. It's not clear why that makes this circumstance so much more odious. In Godin, an innocent party arguably suffered a tremendous injustice as a

19

result of one party's misrepresentation to the other party and the court; in this case, both parties signed and filed the VAP with the Department of Health with their eyes wide open. There is no allegation that mother was under duress or undue pressure from putative father. If anything, the deception in Godin was more unconscionable.

¶ 36. The fact that the deception here left an unrecognized biological parent without notice likewise doesn't distinguish the two cases. In Godin, there presumably was a biological father whose parental rights were potentially undermined by the court's enforcement of the existing paternity judgment. In this case, the alleged biological father has received notice, and has had an opportunity to step forward. He hasn't done so. If anything, the harm to third parties not before the court was greater in Godin, where the actual biological father was apparently never put on notice of the existence of the child or the proceedings concerning that child's parentage.

¶ 37. This is not a case in which an officer of the court falsified evidence presented to the court; it was a filing with the Department of Health by unrepresented individuals. It's impossible to come up with a principled distinction between these facts and any other case in which a party lies, secures a court order, and is then found out. See also Olio, 2012 VT 44, ¶ 20 (holding that husband's deliberate concealment of substantial bank account and affirmative misrepresentations to wife and court in course of doing so, "falls on the 'ordinary fraud' side of the boundary and does not qualify for the narrow exception . . . recognized in Godin." In Godin, this Court held that the wife's knowing misrepresentation to the court that the husband was the child's biological father was not so unconscionable, and did not so undermine the judicial process as to trigger the fraud-on-the-court exception. Given that, I cannot see how the parties' conduct here does fall within that narrow exception.

¶ 38. Moreover, in light of this Court's discussion in Godin, this is a strange context in which to extend the boundaries of the fraud-on-the-court doctrine. The majority has essentially

concluded that recognition of putative father's legally acknowledged parental relationship with this child in the absence of a biological connection is so unconscionable that the absence of a biological connection trumps the ordinary principles of finality. As we noted in Godin, the policies favoring finality are especially strong in the context of parentage determinations. 168 Vt. at 521, 725 A.2d at 909; see also St. Hilaire v. DeBlois, 168 Vt. 445, 448, 721 A.2d 133, 136 (1998) (noting that " 'there is no area of the law requiring more finality and stability than family law' " (internal alteration omitted and quoting Hackley v. Hackley, 395 N.W.2d 906, 914 (Mich. 1986))). In the absence of a competing parent with a constitutionally protected right, I don't see what policy considerations could possibly support a rule of law that would allow a nonbiological parent who has signed a VAP, or the biological parent who has also signed that VAP, to disavow that decision whenever their personal interests change, without regard to the best interests of the child. And the majority does not deal with this Court's express holding in Godin that "absent a clear and convincing showing that it would serve the best interests of the child, a prior adjudication of paternity is conclusive." 168 Vt. at 523-24.[11] It's not clear whether the majority has repealed this express holding by implication, or has simply disregarded it in this case.

¶ 39. In addition, I cannot reconcile the majority's analysis here with our much more recent analysis in Columbia v. Lawton, 2013 VT 2, ¶ 30, 193 Vt. 165, 71 A.3d 1218. In that case, as in this case, a child's biological mother legally stipulated to a putative father's

---

[11] The fact that the judgment in question in Godin arose from a presumption of parentage in the context of a marriage does not meaningfully distinguish it from a judgment arising from a VAP for the purposes of its finality. The Legislature has made clear both that the VAP is final and binding subject only to Rule 60(b) review, 15 V.S.A. § 307(f), and that it intends to extend the same legal protections to children "regardless of whether the child is born during civil marriage or out of wedlock." Id. § 301. Any attempt to distinguish this Court's approach to finality in the context of parentage determinations implicit in a final divorce judgment versus in the context of a VAP would be directly contrary to the Legislature's stated intent. See In re B.L.V.B., 160 Vt. 368, 373, 628 A.2d 1271, 1274 (1993) (construing adoption statute with recognition that Legislature intended to promote best interests of children).

parentage.[12]  Subsequently, another man (Mr. Columbia) filed a parentage action claiming to be the child's actual biological father.  The trial court concluded that Mr. Columbia lacked standing to seek an order recognizing his parentage since another individual was already legally adjudicated to be the child's parent.  We affirmed the trial court's application of the parentage statute, but noted that if Mr. Columbia's claim of parentage was constitutionally protected, he would be entitled to pursue it despite the statutory standing limitations.  Id. ¶ 26.  We concluded that even if genetic testing determined Mr. Columbia to be the child's biological parent, he did not have a constitutionally protected right to parent the child that would overcome the judgment adjudicating another man to be the child's father.  Id. ¶ 27.  We explained that an individual's status as a parent requires consideration of a host of factors, including but not limited to a child's genetic connection, or lack thereof.  Id. ¶ 29.  Given that Mr. Columbia had not had any contact or relationship with the child, he did not formally assert his parentage for more than two years after the child's birth, he had not assumed any responsibility for the child's emotional or material well-being, and another legally adjudicated father had lived in a family relationship with the child, we concluded that the case was not close.  Id. ¶ 29.  The only indicia of parenthood Mr. Columbia could claim was a possible genetic connection to the child.  Id. ¶ 28.

¶ 40.    The upshot of our analysis in Columbia was that the judgment of parentage in favor of the child's first adjudicated father, who we assumed for the purposes of that motion was not, in fact, the child's biological parent, carried the day, even in the face of a claim by another man who was, in fact, the child's biological father.  Id. ¶ 29.  And we reached this even though the assumed actual biological father affirmatively asserted his parental rights through a parentage action just over two years from the child's birth.  Id. ¶ 27.  Columbia was a much stronger case than this one for setting aside a final judgment of parentage because an actual alternative parent

---

[12]  In Columbia, the stipulation was incorporated into a court order.  Again, given that the Legislature has provided that an unrescinded VAP has the status of a court adjudication of parentage, 15 V.S.A. § 307(f), this distinction is immaterial.

was seeking to displace the adjudicated parent. Yet in that case, we upheld the existing parentage judgment in favor of a father who we assumed was not in fact the child's biological father, and left the child's actual (alleged) biological father with no recourse. Id. I cannot square our decision in Columbia with the majority's decision here.

¶ 41. That I have a different view from the majority concerning the legal determinants of parenthood under Vermont's statutes and case law is no secret. See Moreau, 2014 VT 31, ¶¶ 44-86 (Robinson, J., dissenting). But I emphasize that this case does not turn on the question of who qualifies as a legal parent under our laws. The primary question here involves the finality of parentage judgments. The majority's open-ended conclusion that a VAP, signed by two parents who know that one of them is not the child's biological parent, is subject to challenge pursuant to Rule 60(b)(6) without a time limit is inconsistent with our past decisions and the Legislature's expressed policy of finality. It will also, no doubt, have unintended consequences. Almost thirty percent of the children born in Vermont since 1997 have had their parenthood established by a VAP. See K. Schatz, Annual Report on Voluntary Acknowledgment of Parentage Submitted to the Senate Committee on Health and Welfare and the House Committee on Human Services (2015). That's tens of thousands of children whose parentage is established by a VAP. See Vt. Dep't of Health & Human Servs., 2011 Annual Vital Statistics Report, tbl. A-1, Vital Statistics Summary of Vermont 1857-2011 (Oct. 1, 2015), http://healthvermont.gov/research/stats/2011/documents/2011TBLA1.pdf [http://perma.cc/QZ36-VZ2W]. Families organize themselves in reliance on these VAPs. The Office of Child Support relies on them to ensure that children are getting the support they need, and parents are paying the support they should.

¶ 42. Even if only one percent of those cases are similar to this one in that both parents knew that one of them was not biologically related to the child, the majority's decision today leaves hundreds of children, and their parents, vulnerable to a change of heart by either parent—

23

an outcome decidedly at odds with the best interests of the children our parentage statutes are designed to protect. See 15 V.S.A. § 301 ("It is the policy of this state that the legal rights, privileges, duties and obligations of parents be established for the benefit of all children, regardless of whether the child is born during civil marriage or out of wedlock."). A father who has signed and filed a VAP, and has stepped up to the plate and supported a child for years can back out, invoking Rule 60(b)(6) and the majority's decision in this case, leaving the other parent, or the Office of Child Support, with no alternative source of support for the child.[13] A mother who no longer wishes to deal with the partner with whom she formerly parented a child can disavow the VAP, severing the longstanding parent-child bond with the other parent—even though she invited and legally agreed to the co-parenting arrangement long ago, and even if her actions leave that child with only one parent. Wholly apart from my views about the definition of a parent, I would not do violence to the goal of finality that runs through our case law—most especially when it comes to legally established parent-child relationships.

## II.

¶ 43. The logic of the majority's analysis of the independent parentage claim in this case escapes me. Having just set aside the VAP signed and filed by mother and putative father, the court concludes that putative father cannot pursue a parentage action because the existence of the VAP (that the court has just set aside) defeats a new parentage action. Ante, ¶ 20. If there is

---

[13] For this reason, I am perplexed that the Office of Child Support (OCS) advocated a position so clearly at odds with its institutional interests, and the public interests that it represents. See 33 V.S.A. § 4101(b) ("The paramount interest of the state of Vermont is the welfare of its children. The establishment and enforcement of family support obligations is therefore an important function in this regard. The Office of Child Support in carrying out its responsibility shall be guided by the best interests of the child, but not the economic interests exclusively in an action for child support."); Powers v. Office of Child Support, 173 Vt. 390, 397, 795 A.2d 1259, 1265 (2002) ("Vermont's statutory scheme was not intended to benefit individual children and custodial parents, but was intended to benefit Vermont society as a whole. Vermont law does not create a specific duty owed by OCS to any particular groups of persons. . . . [I]n bringing support actions on behalf of families, OCS is required by statute to 'be guided by the best interests of the child for whose benefit the action is taken.' " (quoting 33 V.S.A. § 4106(f))).

no VAP, because the court has set it aside, it cannot be a bar to putative father's parentage action. These are alternative legal theories. See, e.g., Stamp Tech, Inc. ex rel. Blair v. Ludall/Thermal Acoustical, Inc., 2009 VT 91, ¶ 16, 186 Vt. 369, 987 A.2d 292 (noting party "is, of course, entitled to plead different legal theories in the alternative").

¶ 44. On the merits, I won't belabor the independent-statutory-action issue. I've laid out my views in detail recently enough. See Moreau, 2014 VT 31, ¶¶ 44-86 (Robinson, J., dissenting). As noted above, I believe the majority's decision in this case represents another significant step backward. The majority ascribes so much significance to the biological connection between parent and child, or lack thereof, that this factor not only eclipses all other factors in the analysis, but also renders longstanding established judgments a nullity.

¶ 45. But I do note the ways in which putative father's case for parentage is stronger than the father in the Moreau case. A factor that this Court and other courts have identified as among the most significant in determining whether an individual is a child's legal parent is the intentions and expectations of the putative parent and the established legal parent. See, e.g., Miller–Jenkins, 2006 VT 78, ¶¶ 56-57, 180 Vt. 441, 912 A.2d 951 (concluding putative mother was child's parent because "it was the expectation and intent of both [mothers] that [putative mother] would be [child's] parent" and noting "[w]e adopt the result in this case as a matter of policy, and to implement the intent of the parties."); Godin, 168 Vt. at 523, 725 A.2d at 910 ("Where the presumptive father has held himself out as the child's parent, and engaged in an ongoing parent-child relationship for a period of years, he may not disavow that relationship and destroy a child's long-held assumptions, solely for his own self-interest"); see also Moreau, 2014 VT 31, ¶¶ 69-75 (Robinson, J., dissenting) (collecting cases from other jurisdictions discussing determinants of parentage).

¶ 46. This is not a case in which, in the course of going about their lives without much reflection, the parties have fallen into a pattern of conduct that gives rise to a parentage claim on

the part of a nonbiological parent by virtue of his established bond with the child, his role in the child's life, and the parties' implicit representations to one another and the outside world concerning the status of the nonbiological parent. Rather, in this case, the parties could not have expressed their intentions and expectations with respect to their respective roles and status concerning this child any more clearly. Both putative father <u>and</u> mother signed and filed with the state a document acknowledging father's parentage. At the top, the document states:

> Parentage creates specific legal obligations. . . . You should seek legal advice before signing this form if you have any questions or if you are confused about your rights and responsibilities. Further, information about the legal rights and responsibilities of a parent is available on the back of this form. The legal rights and responsibilities of a parent are serious, and you should not sign this form unless you understand them.

The back of the page describes the consequences of the acknowledgment, including the fact that both parents have the right to seek parental rights and responsibilities and both are financially responsible for the child. Both parties signed this form within ten days of the child's birth. In that sense, this case is much more like <u>Godin</u> than <u>Moreau</u>. In fact, it's a stronger case than <u>Godin</u>. In <u>Godin</u> the nonbiological father's parental status arose as a corollary to the nonbiological father's marital relationship with mother. In this case, mother and putative father directly addressed the issue and memorialized their expectations in a legal document specifically relating to the child, and they filed the document with the Department of Health.

¶ 47. Mother clearly expressed her intention from the outset to recognize putative father as the child's legal father, and putative father clearly expressed his intention from the outset to accept that responsibility. Putative father actually exercised that responsibility and acted as a parent to this child for over two years. No other claimant has come forward seeking to assume the responsibilities of parentage. Given these factors, I believe that putative father is entitled to a hearing and findings applying the factors this Court identified in <u>Miller-Jenkins</u>, 2006 VT 78,

¶ 56, as well as other factors we have applied in similar cases, see Moreau, 2014 VT 31, ¶¶ 63-68 (Robinson, J., dissenting).

### III.

¶ 48. I direct these final remarks to the Legislature rather than the majority. I join Justice Dooley in strongly urging the Legislature to take up these issues. Vermont was once a national leader in applying our laws to promote the best interests of children in the context of evolving family structures. See, e.g., In re B.L.V.B., 160 Vt. 368, 373, 628 A.2d 1271, 1274 (1993) (construing step-parent adoption law to allow adoption by unmarried partner of children's legal parent); Baker v. State, 170 Vt. 194, 223, 744 A.2d 864, 885 (1999) (recognizing that exclusion of same-sex couples from the legal benefits, protections and obligations of civil marriage violates the Vermont Constitution); Miller-Jenkins, 2006 VT 78, ¶¶ 56-57 (recognizing parental status of civil union partner of parent of child conceived through donor insemination). Given that, it's odd that we are now behind the curve in failing to address a diverse range of challenging family law issues that have arisen as family structures in our society have continued to evolve.

¶ 49. New legislation concerning parentage would enable the Legislature to identify and communicate its intentions with respect to the various policy issues impacting the best interests of children, would provide clarity for courts struggling with these issues, and would ultimately benefit the children of Vermont.[14]

_____
Associate Justice

---

[14] For example, this case would have been easier under the Uniform Parentage Act (2000). The rescission period with respect to the acknowledgement would have expired after the sixty-day period following the acknowledgement, or before the first hearing to adjudicate an issue relating to the child, whichever happened first. Unif. Parentage Act § 307 (Unif. Law Comm'n 2000) (amended 2002). Thereafter, mother and putative father could have sought to challenge the acknowledgment only on the basis of fraud, duress, or material mistake of fact, and only if the challenge was brought within two years after the acknowledgment.